*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0100P (6th Cir.)
File Name:  00a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

JOHN L. DOYLE, III, M.D.;
MARIANN DOYLE,
  *Plaintiffs-Appellees,*

  *v.*

No. 99-5259

HEALTH POSSIBILITIES,
P.S.C.; URGENT TREATMENT
CENTERS OF KENTUCKY, INC.;
BARRY BURCHETT, M.D.;
JOHN LANGEFELD, M.D.;
JOHN DOES, sued as unknown
persons; PHYSICIANS OF UTC,
P.S.C.,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
Nos. 96-00485—Karl S. Forester, District Judge.

Argued:  January 27, 2000

Decided and Filed:  March 22, 2000

1

Before:  JONES, NORRIS, and SILER, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Matthew M. Collette, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Appellant.  Thomas W. Miller, MILLER, GRIFFIN & MARKS, Lexington, Kentucky, Richard F. O'Malley, Jr., SIDLEY & AUSTIN, Chicago, Illlinois, for Appellees. **ON BRIEF:** Mark B. Stern, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Appellant. Thomas W. Miller, MILLER, GRIFFIN & MARKS, Lexington, Kentucky, Richard F. O'Malley, Jr., SIDLEY & AUSTIN, Chicago, Illlinois, Stephen L. Barker, Douglas L. McSwain, STURGILL, TURNER, BARKER & MALONEY, Lexington, Kentucky, Hiram Ely III, GREENEBAUM, DOLL & McDONALD, Louisville, Kentucky, for Appellees.

_____

**OPINION**

_____

NATHANIEL R. JONES, Circuit Judge.  Raising an issue of first impression in this circuit, this case requires that we determine whether the Attorney General's consent is required before a private plaintiff may settle or otherwise dismiss an action under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)(1).  The district court concluded that the consent provisions of the FCA apply only to attempts to dismiss *qui tam* actions prior to the government's initial intervention decision, and that when the government affirmatively declines to intervene, a private plaintiff can settle a *qui tam* action notwithstanding the government's disapproval. We hold, however, that a *qui tam* plaintiff may not seek a voluntary dismissal of any action under the False Claims Act without the Attorney General's

consent. Accordingly, we **VACATE** the district court's judgment and **REMAND** this case for further proceedings.

## I.

Plaintiffs-Appellees Dr. John and Mariann Doyle were formerly employed by Defendant-Appellee Health Possibilities, P.S.C. Health Possibilities is a medical services provider that staffed various health clinics in Lexington, Kentucky, including a number of clinics owned and operated by Defendants-Appellees Urgent Treatment Centers of Kentucky, Inc. ("UTC"), Dr. Barry Burchett, and Dr. John Langefeld. Dr. Doyle, Mariann's husband, worked as a physician, while Mrs. Doyle was a physician's assistant. The Doyles' dispute with Defendants began in February 1996, when a co-worker allegedly stated that Dr. Doyle had committed adultery and used drugs. In May of that year, Dr. Doyle responded by filing a defamation suit in state court against the co-worker, a supervisor, and Defendants. Around the same time, the Doyles began to believe that Defendants were submitting false Medicare claims to the Department of Health and Human Services. The Doyles eventually filed a separate federal court action under the "*qui tam*" provisions of the False Claims Act, 31 U.S.C. §§ 3729, 3730(b), which allow private parties to recover damages for fraud committed against the United States.[1] The Doyles claimed that Defendants had violated the FCA by illegally seeking reimbursement for physician assistant services that were not "incident to" physician services. *See* J.A. 21-28.

As required by § 3730(b)(2) of the FCA, the Complaint and a subsequent First Amended Complaint were filed under seal.

---

[1]"'Qui tam' is an abbreviation for the Latin phrase 'qui tam pro domino rege quam pro si ipso in hae parte seqintur,' which means 'who sues on behalf of the King as well as for himself.'" *United States ex rel. Branhan v. Mercy Health System of Southwest Ohio*, No. 98-3127, 1999 WL 618018, at *4 n.5 (6th Cir. Aug. 5, 1999) (unpublished opinion) (citing Black's Law Dictionary 1251 (6th ed. 1990)).

The sealed complaint procedure grants the United States sixty days to investigate the claims of a *qui tam* plaintiff, who is called a "relator," to determine whether it wants to intervene. *See* 31 U.S.C. § 3730(b)(2). In January 1997, the government declined to intervene in the Doyles' suit, and the Complaint was subsequently served on Defendants. *See* J.A. at 35.[2] After extensive discovery, the Doyles filed a Second Amended Complaint in May 1998. The Second Amended Complaint added new allegations, claiming that Defendants had fraudulently inflated their Medicare bills by "upcoding," or using billing codes that signified services that were more expensive than the services Defendants actually provided.[3]

Shortly after filing the Second Amended Complaint, the Doyles and Defendants reached a settlement agreement. Under the agreement, the *qui tam* suit was settled in conjunction with Dr. Doyle's pending state court defamation action. Regarding the *qui tam* suit, the Doyles agreed to release Defendants from all claims "of any . . . kind or nature whatsoever" that related to their submission of Medicare claims, or claims under any other federal health care

---

[2] The district court deemed this refusal to intervene to apply to the charges lodged in both the original complaint and the First Amendment Complaint. J.A. at 6.

[3] The Second Complaint was apparently served on the government and Appellees simultaneously, and therefore was not filed under seal so as to trigger the 60-day intervention period. *See* Gov't Br. at 7; J.A. at 13. Nevertheless, the Doyles met with the government in March, 1998 to discuss the "upcoding" charges, and the government chose not to act. J.A. at 261-262. Appellees appear to argue that there was no need to file the amended complaint under seal, as the §3730(b)(2) intervention procedure – allowing the government to intervene as a matter of right – applies only after the filing of the original complaint. Appellees contend that thereafter the government is limited to intervening for "good cause" under § 3730(c)(3), and that it could have done so as new allegations would certainly constitute "good cause." *See* UTC Br. at 11 n. 8. In any event, we do not reach this issue because the government does not raise this purported lack of notice as a basis for reversal or for rejecting the settlement.

---

before a voluntary dismissal motion is properly presented to the court.

Appellees' mootness contention is also misplaced. Their mootness argument fails to appreciate that a relator acts on the government's behalf, acts to vindicate governmental interests, and that the government is the real party in interest. *See supra*. As noted before, the relator would not have standing to bring an FCA claim if it were not clear that she acted in the government's stead. Thus, if the government's interests are adverse to those reflected in a putative settlement agreement, a live controversy undoubtedly exists.

### III.

In sum, we find nothing in the structure of § 3730, legislative history, or policy that suggests that we should ignore the undeniably clear and plain language of § 3730(b)(1). The *Searcy* court concluded that:

> For more than 130 years, Congress has instructed courts to let the government stand on the sidelines and veto a voluntary settlement. It would take a serious conflict within the structure of the False Claims Act or a profound gap in the reasonableness of the provision for us to be able to justify ignoring this language. We can find neither.

*Searcy*, 117 F.3d at 160. We agree with this conclusion, and hold that a *qui tam* plaintiff may not seek a voluntary dismissal of any action under the False Claims Act without the Attorney General's consent. Accordingly, we **VACATE** the judgment of the district court, and **REMAND** this case for further proceedings.

arise if we were to construe § 3730(b)(1) to apply after the sixty day period. Appellees contend that such a construction would impermissibly enable the Executive Branch to infringe upon the Article III jurisdiction of federal courts, and that when the relator and the defendant have agreed to a putative settlement, mootness problems arise if courts are forced to keep these cases on their active dockets.

To the extent any separation of powers issues exist, they are not abated by limiting the consent provision to the sixty day period. If the consent provision impermissibly infringes upon Article III jurisdiction, the constitutional harm is not cured by limiting the infraction to sixty days. In any event, Appellees' contentions are without merit. Our conclusion might be different if we construed the consent requirement to apply to involuntary dismissals. However, a number of federal courts have held that the § 3730(b)(1) "consent" provision applies "only where the plaintiff seeks voluntary dismissal . . . and not where the court orders dismissal." *Minotti*, 895 F.2d at 103-04; *see In re Schimmels*, 127 F.3d 875, 883 n. 16 (9th Cir. 1997); *Milam*, 961 F.2d at 49. This construction is consistent with congressional intent. Prior to the enactment of the current "dismissal" language, the FCA provided that the action could not be "withdrawn or discontinued" without the government's consent. *See* 31 U.S.C. § 232(b) (1976); *Id.* at 103; *see also United States ex rel. Laughlin v. Eicher*, 56 F.Supp. 972, 973 (D. D.C. 1944) (holding that predecessor to current consent provision "only refers to voluntary dismissals"). As the *Minotti* court noted, this language was changed to reflect modern terminology and usage, and was not designed to affect a substantive change in the statute's meaning. *See* 895 F.2d at 103-04. In the voluntary dismissal context, there are no jurisdictional problems as the consent provision simply requires that the relator receives the permission of the government, on whose behalf the relator acts, before she can voluntarily dismiss a *qui tam* action. Thus, the relator's obligation to receive the Attorney General's consent is a precondition that must be satisfied

reimbursement program. J.A. at 204-205. In exchange, Defendants agreed to pay the Doyles $150,000 in attorneys fees and costs, and to implement a corporate compliance program designed to ensure that they prospectively complied with federal and state law governing medical reimbursements. *See* J.A. at 263-268. While the Doyles did not receive any damages for releasing the FCA claims, Dr. Doyle did receive $150,000 in damages – and $50,000 for attorneys' fees and costs – for settling the defamation action. *See* Gov't Br. at 8; UTC Br. at 9-10; J.A. at 230. While § 3730(d)(2) of the FCA ensures that the United States receives at least 70% of any FCA settlement, the government did not receive any damages here because the FCA suit was settled for fees and injunctive relief.

Asserting that the settlement did not protect the interests of the public, the United States objected to the settlement. The government contended that § 3730(b)(1) of the FCA plainly provides that a *qui tam* action "may be dismissed only if the court and the Attorney General give written consent to the dismissal . . . ," and therefore a relator cannot settle an FCA suit without the government's permission. The United States further asserted that the language of the statute is unambiguous, and that such a veto power is essential to ensuring the vindication of the public interest in *qui tam* actions. Concerning the merits of the settlement, the United States contended that the compliance program was insufficient consideration for an all-encompassing release, and that the inadequacy of this consideration was exacerbated by the compliance program's alleged lack of oversight mechanisms. The United States further objected that all monies flowed either to the relators or counsel, and suggested that the relators essentially channeled damages payments to the defamation action to avoid the settlement division requirements of § 3730(d)(2). *See* J.A. at 229-230.

The district court rejected the government's argument that § 3730(b)(1) provides the Attorney General with an absolute veto of any proposed *qui tam* settlement. The district court

held that the "consent" provision applies only to attempts to settle or dismiss actions prior to the expiration of the 60-day initial intervention period, and that to the extent the United States wanted to challenge a settlement after it had already declined intervention, it had to seek "good cause" intervention under § 3730(c)(3). In so holding, the district court further ruled that the government constructively consents to any prospective dismissal when it decides not to intervene. Finding that the government had "good cause" to object to the breadth of the waiver provisions, the district court allowed the government to intervene to challenge that portion of the settlement, but rejected its challenge to the monetary terms.

The Doyles and Defendants subsequently twice modified the release language. The final language provided that all civil claims, whether judicial or administrative, would be released in exchange for the previously approved fees payments and the corporate compliance plan. J.A. at 310. The district court thereafter approved the settlement and dismissed the action, reiterating its earlier holding that after the government declines intervention, a relator may settle a § 3730 suit without the Attorney General's consent. The United States now appeals the dismissal.

## II.

This appeal turns entirely on the scope of the FCA's command that *qui tam* suits may not be dismissed without the Attorney General's consent. Section § 3730(b)(1) of the FCA provides as follows:

> A person may bring a civil action for a violation of Section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. *The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.*

31 U.S.C. § 3730(b)(1) (emphasis added). We review the district court's construction of this language *de novo*. *See*

of the United States to veto a settlement purportedly made on its behalf is entirely consistent with an intention to foster *qui tam* litigation. By providing financial incentives and limiting the opportunity for the government to completely take over a *qui tam* action after the initial sixty-day period, the 1986 amendments certainly "encouraged more private enforcement" of the Act. Indeed, nowhere in the legislative history relied upon by the *Killingsworth* court, or anywhere else in the 1986 amendments, does Congress evince an intention to limit the § 3730(b)(1) "consent" provision to the sixty-day period. Without such a clearly expressed purpose, we cannot amend the plain language of a statute. *See St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 788 (1981) ("[I]ndefinite congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication."); *Morton v. Mancari*, 417 U.S. 535, 550 (1974) ("In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.").[6]

Finally, Appellees assert that because § 3730(b)(1) requires the Attorney General's consent for "dismissal," and not just settlements, separation of powers and mootness issues would

---

[6]We also reject the district court's conclusion, which the Appellees do not raise on appeal, that the government's decision not to intervene was "tantamount to consent by the Attorney General to have the action dismissed." J.A. at 282 (citation omitted). There is absolutely no statutory authority for the proposition that simply because the government decides not to expend the resources to proceed with an action itself, it thereby authorizes the relator to settle the government's claims in whatever manner he wishes. *See United States ex rel. McGough v. Covington Technologies Co.*, 967 F.2d 1391, 1397 (9th Cir. 1992) (holding that the government's initial decision not to intervene is not equivalent to § 3730(b)(1) "consent"). Indeed, such a construction would only force the government to unnecessarily intervene in *qui tam* cases and thereby frustrate the efficacy of the *qui tam* framework. *Cf. Berge*, 104 F.3d at 1458 (noting that there is "little purpose" to *qui tam* framework if government is forced to pursue all meritorious claims).

*Vergos v. Gregg's Enterprises, Inc.*, 159 F.3d 989, 990 (6th Cir. 1998). The starting point in a statutory interpretation case is the language of the statute itself. *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 210 (1979); *Vergos*, 159 F.3d at 990. In construing federal statutes, we presume that the ordinary meaning of the words chosen by Congress accurately express its legislative intent. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164 (1985). Thus, "if the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced." *Hudson v. Reno*, 130 F.3d 1193, 1199 (6th Cir. 1997). Our inquiry into legislative meaning is additionally aided by contemporaneous legislative history and the statutory context of the pertinent language. *See Walton v. Hammonds*, 192 F.3d 590, 594 (6th Cir. 1999).

While the interpretation of the "consent " requirement's breadth presents an issue of first impression in this Court, two of our sister circuits have directly confronted this issue.[4] In *Killingsworth v. Northrop Corp.,* the Ninth Circuit held that the "consent" provision is not absolute, but applies only when the United States is contemplating its initial intervention decision. 25 F.3d 715, 722 (9th Cir. 1994). The Ninth Circuit held that when the Attorney General declines to intervene, the relator no longer needs her consent to settle, and the government is restricted to challenging the settlement for "good cause" under § 3730(c)(3). *See id.* at 722-23. Analyzing the legislative history of the FCA and relevant amendments, the *Killingsworth* court found that Congress intended "to place full responsibility for False Claims Act litigation on private parties." *Id.* at 722. The Ninth Circuit concluded that this intent is "fundamentally inconsistent" with

---

[4]Other appellate courts have discussed issues that implicated the scope of the consent requirement, *see United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992); *Minotti v. Lensink*, 895 F.2d 100, 104 (2d Cir. 1990), but only the Fifth and Ninth circuits have definitively addressed whether it applies after the 60-day intervention period.

---

The original FCA provided a version of the current consent requirement, but provided no mechanism for government intervention. *See* Act of March 2, 1863, ch. 67, 12 Stat. 696; *Searcy*, 117 F.3d at 159. Although Congress enacted the original FCA in 1863, it did not grant the government any intervention authority until the statute was amended in 1943, *see* Pub.L. No. 78-213, ch. 377, 57 Stat. 608 (1943), and it did not allow "good cause" intervention until the statute was re-amended in 1986. *See* False Claims Amendments Act of 1986, Pub.L. No. 99-562, 100 Stat. 3153, 3154 (1986); *see also Searcy*, 117 F.3d at 159. Thus, the original FCA would obviously not suggest that the consent requirement is limited to the sixty day period, as at the time the statute was enacted, no sixty day intervention period existed.

Moreover, there is no specific indication that any of the amendments to the FCA were intended to limit the "consent" requirement to the sixty-day intervention period. It is true, as the *Killingsworth* court noted, that the 1986 amendments were designed "to encourage more private enforcement" of the Act by "increas[ing] incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government." *See* S. Rep. No. 99-345, at 23-24 (1996), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5288-89; *see also Killingsworth*, 25 F.3d at 721. The 1986 amendments also indicate that the provision allowing government intervention for "good cause" after the initial sixty-day period expands on the "limited opportunity for government involvement" in *qui tam* actions. *Id.* at 5266, 5291-92. The *Killingsworth* court relied on this legislative history in concluding that Congress intended "to place full responsibility for False Claims Act litigation on private parties" and that an absolute right to veto settlement agreements was inconsistent with this intention. *Killingsworth*, 25 F.3d at 722.

However, simply because Congress intended to provide more incentives to private parties to bring *qui tam* actions does not signal that it intended to strip away the government's power to consent to settlements made in its name. The right

"the asserted 'absolute' right of the government to block a settlement and force a private party to continue litigation." *Id.* The court further noted that the statute provides that the government "proceed[s]" with the action when it decides to intervene, yet the relator "conduct[s]" the action when the government does not intervene. *Id.*; *see* 31 U.S.C. § 3730(b)(2) & (c)(3). The court construed this framework to require that, absent intervention for "good cause" under § 3730(c)(3), the relator's right to "conduct" an action necessarily included the right to settle, and the government essentially forfeited any veto authority when it decided not to "proceed" with the action itself. *Id.* at 722-23.

On the other hand, the Fifth Circuit, concluding that the plain language of § 3730(b)(1) is "as unambiguous as one can expect," held that the statute plainly allows the government to veto proposed settlements. *Searcy v. Phillips Electronics of N. Am. Corp.*, 117 F.3d 154, 159 (5th Cir. 1997). In reaching this conclusion, the Fifth Circuit found nothing in either legislative history or the statute's structure to negate the language's plain meaning. *See id.*

We now join the Fifth Circuit in rejecting the Ninth Circuit's analysis, and hold that a relator may not seek voluntary dismissal of any *qui tam* action without the Attorney General's consent. Section 3730(b)(1) unqualifiedly provides that a *qui tam* action "may be dismissed only if the court and Attorney General give written consent." This language clearly does not limit the consent provision to the sixty-day intervention period. If Congress wanted to limit the consent requirement to the period before the United States makes its initial intervention decision, we presume that it knew the words to do so. *See Bates v. United States*, 118 S.Ct. 285, 290 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."); *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (providing that courts have a "duty to refrain from reading a phrase into the statute when Congress has left it out").

authorize the court to require the parties to accept a settlement to which they have not agreed.").

In terms of statutory context and structure, we note that the consent language appears immediately after the provisos stipulating that a relator acts "for [himself] and for the United States Government," and that "[t]he action shall be brought in the name of the Government." *See* 31 U.S.C. § 3730(b)(1). These requirements are indispensable to the *qui tam* framework, as relators have Article III standing to bring FCA actions only because they act on the government's behalf.[5] The location of the consent provision immediately after the command that the action be brought in the government's name suggests that it is an important component of the government's ability to regulate *qui tam* actions.

Additionally, nothing in the statute's legislative history compels a result contrary to § 3730(b)(1)'s plain meaning.

---

[5]On appeal, none of the parties raise the threshold issue of whether the Doyles have standing to bring an action under the FCA. Even if no party raises the propriety of a plaintiff's standing, we "are under an independent obligation to examine [our] own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Because the United States is the real-party-in-interest in FCA litigation, and relators are statutorily empowered to act on the United States' behalf, relators invoke the standing of the United States to bring *qui tam* actions. *See United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998); *United States ex rel. Berge v. Board of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1457-58 (4th Cir. 1997); *United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1213 (7th Cir. 1995); *Kriendler & Kriendler*, 985 F.2d at 1154. *See also Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 120 S.Ct.523 (1999) (mem.) (ordering parties in *qui tam* appeal to brief whether relators have Article III standing to bring FCA actions). In the instant case, the United States clearly has standing to challenge Defendants' alleged attempt to illegally appropriate federal funds. Therefore, as relators – the statutorily designated agents of the government – the Doyles also have standing to vindicate the harms committed against the government.

no monetary recovery on the FCA claim, but Dr. Doyle did manage a $150,000 personal recovery on the defamation claim. While we make no particular conclusions of the propriety of the defamation settlement in this case, we merely note that the potential for abuse exists and veto authority is essential to ensuring the public interest is vindicated. Accordingly, we conclude that the policies served by the veto power are entirely consistent with the conclusion compelled by § 3730(b)(1)'s plain meaning: that a relator may not settle any *qui tam* action without the Attorney General's consent.

This holding is also consistent with other portions of § 3730, including the relator's right to "conduct" a *qui tam* suit when the government decides not to intervene. Nothing in the statute suggests that the right to "conduct" an action provides the relator with unilateral and ultimate settling authority. Moreover, as the *Searcy* court noted, "[a] relator has 'conducted' an action if he devises strategy, executes discovery, and argues the case in court, even if the government frustrates his settlement efforts." 117 F.3d at 160. Nor does the right to "conduct" the action annul the government's status as the real-party-in-interest in *qui tam* litigation. *See Milam*, 961 F.2d at 50 ("[T]he United States is the real-party-in-interest in any False Claims Act suit, even where it permits a *qui tam* relator to pursue the action on its behalf."); *United States ex rel. Hyatt v. Northrop Corp.,* 91 F.3d 1211, 1217 n. 8 (9th Cir. 1996) (holding that relators "sue on behalf of the government as agents of the government, which is always the real-party-in-interest"); *Searcy*, 117 F.3d at 156 ("[T]he United States is a real party in interest even if it does not control the False Claims Act suit."); *United States ex rel. Rodgers v. Arkansas*, 154 F.3d 865, 868 (8th Cir. 1998) (noting that the United States is always the real-party-in-interest in *qui tam* litigation). The government's status as the real-party-in-interest renders a relator's unilateral attempt to settle akin to impermissibly bargaining away the rights of a third party. *See, e.g., Evans v. Jeff D.*, 475 U.S. 717, 726 (1986) ("[T]he power to approve or reject a settlement negotiated by the parties . . . does not

Moreover, we find that the clear import of this language is strengthened by the FCA's purpose, structure and legislative history. Congress' manifest desire to ensure that the government retains significant authority to influence the outcome of *qui tam* actions – even when it decides not to intervene – is entirely consistent with the nature of *qui tam* litigation. The FCA's *qui tam* provision is

> passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain.

*Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997) (internal quotations and citation omitted). Because the scope of fraud against the government is much broader than the government's ability to detect it, the *qui tam* provisions allow the government to uncover fraud that it would not otherwise be able to discern. *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 650-51 (D.C. Cir. 1994). Pursuant to this goal, the FCA provides private actors with a variety of incentives to bring *qui tam* actions, and significant influence over the ensuing development of *qui tam* suits – including "the right to conduct the action" when the government decides not to intervene. *See* 31 U.S.C. § 3730(c)(3) (providing right to "conduct the action" when government declines intervention); 31 U.S.C. § 3730(d) (providing that, even when the government does intervene, the relator remains a party to the action and is guaranteed at least fifteen percent of any recovery); 31 U.S.C. § 3730(c)(2)(B) (providing that the relator retains the right to challenge any settlements reached by the government as either unfair, inadequate, or unreasonable); *see also Killingsworth,* 25 F.3d at 720 ("The statutory scheme of the False Claims Act provides protection for the rights of both the relator and the government.").

However, given that private opportunism and public good do not always overlap, *see Searcy*, 117 F.3d at 160; *see also United States ex re. Rabushka v. Crane Co.*, 40 F.3d 1509, 1519 (8th Cir. 1994) (Magill, J., dissenting) (noting that the *qui tam* provisions "set[] a rogue to catch a rogue") (citation omitted), and that the harms redressed by the FCA belong to the government, *see United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993), the FCA provides a number of mechanisms to ensure that the government retains significant authority to regulate *qui tam* litigation. *See Milam*, 961 F.2d at 49 (noting that the government maintains "extensive power" to control the course of *qui tam* litigation). For example, not only does the government retain absolute authority to intervene and "proceed" with an action during the sixty days after the complaint was filed, it can intervene for "good cause" at any time in the litigation. *See* 31 U.S.C. § 3730(c)(3). Moreover, even when the government does not intervene, it nevertheless receives at least seventy percent of any recovery. *Id.* at § 3730(d)(1)-(2).

In our view, the power to veto a privately negotiated settlement of public claims is a critical aspect of the government's ability to protect the public interest in *qui tam* litigation. The FCA is not designed to serve the parochial interests of relators, but to vindicate civic interests in avoiding fraud against public monies. *See United States v. Northrop Corp.*, 59 F.3d 953, 968 (9th Cir. 1995) ("[T]he private right of recovery created by the qui tam provisions of the FCA exists not to compensate the qui tam relator, but the United States. The relator's right to recovery exists solely as a mechanism for deterring fraud and returning funds to the federal treasury."); *see also United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) (stating that the FCA's *qui tam* provisions "have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims actions, even when the relator has initiated the process"). Without the power to consent to a proposed settlement of an FCA action,

the public interest would be largely beholden to the private relator, who – absent "good cause" government intervention – would retain sole authority to broadly bargain away government claims.

The recovery division requirements of the FCA provide further incentive for the over-broad release of government claims. *See* 31 U.S.C. § 3730(d) (requiring that the government receive at least seventy percent of any *qui tam* recovery). As the *Searcy* court recognized:

> [R]elators can manipulate settlements in ways that unfairly enrich them and reduce benefits to the government. This case presents a relator who allegedly wants to trade on the defendants' desire to maximize preclusive effects. Plaintiffs ordinarily prefer to keep their options open; agreeing not to bring future suits can be costly. In qui tam litigation, however, there is a danger that a relator can boost the value of settlement by bargaining away claims on behalf of the United States [at little cost to himself].

*Searcy*, 117 F.3d at 160. The potential for such profiteering is exacerbated when, as here, a relator couples FCA claims with personal claims. In these circumstances, a relator can avoid the FCA's recovery division requirements by allocating settlement monies to the personal claims. Relators can thereby use the bait of broad claim preclusion to secure large settlements, while steering any monetary recovery to the personal action. *See Searcy*, 117 F.3d at 160 (noting that in *Killingsworth* litigation, relator settled an FCA claim for $1.5 million, but settled a personal wrongful termination claim for $ 2.7 million, illustrates manipulation of *qui tam* suit). *See also Christopher C. Frieden*, Comment, *Protecting the Government's Interests: Qui Tam Actions Under the False Claims Act and the Government's Right to Veto Settlements of Those Actions*, 47 Emory L.J. 1041, 1071 (1998) (noting the use of "sweetheart settlements" to avoid the seventy percent allocation). Indeed, in this case, the Doyles received