NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0175n.06

No. 24-3022

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA *ex rel.* USN4U, LLC.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

USN4U, LLC,

    Relator - Appellant,

    v.

WOLF CREEK FEDERAL SERVICES, INC., et al.,

    Defendants - Appellees.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**FILED**
Mar 31, 2025
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

</td></tr>
</table>

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

**CLAY, Circuit Judge.** Relator USN4U, LLC appeals from the district court's order granting the United States' motion to intervene and dismiss USN4U's second amended complaint in this *qui tam* action. USN4U alleges that Wolf Creek Federal Services, Inc. and several of its employees[1] (collectively, "Wolf Creek") violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, by defrauding the National Aeronautics and Space Administration ("NASA"). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

---

[1] The employees are project manager Christopher Logan, lead carpenter Anthony Santillo, and program manager Timothy Tesch.

## I.   BACKGROUND

### A.  Factual Background

Wolf Creek provides building maintenance services to the federal government.  Between 2013 and 2023,[2] Wolf Creek performed repair and maintenance services at NASA's Glenn Research Center in Cleveland, Ohio.  Douglas Warren worked as a pipefitter for Wolf Creek from the beginning of its NASA contract until his termination by Wolf Creek in 2016.  Following his termination, Warren formed USN4U.  Warren is USN4U's sole member.  USN4U claims that Wolf Creek defrauded NASA by inflating its project proposal prices, causing NASA to overpay for the work Wolf Creek performed for NASA.

### B.  Procedural History

#### Initial Proceedings and Prior Appeal

Acting on behalf of the United States, USN4U commenced this action on March 17, 2017. USN4U filed the complaint under seal pursuant to 31 U.S.C. § 3730(b)(2), which requires FCA claims to "remain under seal for at least 60 days" and FCA plaintiffs to provide the government with a "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses."  After FCA complaints are filed, the government may intervene in the action, a process which allows the government to "assume[] the role of lead prosecutor." *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005).  The government may also request an extension of the sixty-day sealing period; during the extended sealing period, "the proposed defendant is not notified of the claim."  *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1035 (6th Cir. 1994).  The government in the instant case

---

[2] According to testimony before the district court, Wolf Creek's NASA contract concluded on October 1, 2023.

requested five extensions of the sealing period before declining to intervene in this action on December 11, 2019. The following day, the district court unsealed the complaint and ordered USN4U to serve Defendants.

On June 26, 2020, USN4U filed an amended complaint. The following month, Defendants moved to dismiss the amended complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim under the FCA. USN4U opposed Defendants' motion to dismiss and subsequently moved to file a second amended complaint. Defendants objected to USN4U's motion, arguing that USN4U's proposed second amended complaint also failed to plead presentment—a necessary element of an FCA claim—with sufficient particularity and failed to state a claim for fraudulent inducement under the FCA.

On November 3, 2020, the district court granted Defendants' motion to dismiss with prejudice and denied USN4U's motion for leave to file a second amended complaint. The district court held that USN4U failed to identify a false claim presented to the government by Wolf Creek in violation of the FCA because the work order proposals posited by USN4U as false claims were merely estimates sent to the government to review. In addition, the district court held that USN4U failed to plead a fraud-in-the-inducement scheme because USN4U did not adequately plead that the alleged false labor estimates in Wolf Creek's work order proposals induced the government to pay more money to Wolf Creek. Following USN4U's appeal to this Court, we reversed the district court's decision and remanded for further proceedings. *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 518 (6th Cir. 2022). We rejected the district court's characterization of the work orders identified by USN4U and held that USN4U adequately "stated a fraudulent inducement claim based on its allegations that Wolf Creek falsely inflated cost

estimates in its work order proposals and thus induced NASA to agree to contracts at that price point." *Id.* at 513.

**Defendants' Motion to Dismiss and Disqualify USN4U**

On remand, the district court granted USN4U's motion to amend the complaint and directed Defendants to file an answer. Defendants filed their answer on June 20, 2022, and the parties commenced discovery. On August 23, 2023, before the close of discovery, Defendants filed a motion to dismiss the second amended complaint and disqualify USN4U, arguing that dismissal was appropriate because Warren violated the FCA's sealing requirement by disclosing the lawsuit to his former girlfriend, Wendy Cullinan, and Daniel Ricci, a former Wolf Creek employee. USN4U opposed Defendants' motion, arguing that dismissal was unwarranted because the government's investigation concerning USN4U's allegations against Wolf Creek was not impaired by the alleged seal breach.

During a status conference on August 28, 2023, the district court scheduled an in-person hearing concerning Defendants' motion to dismiss and ordered the parties and government to submit additional briefing. Defendants subsequently filed a brief further supporting their motion to dismiss the second amended complaint, which the government and USN4U opposed. The government argued that Warren's breach of the seal "constitute[d] serious misconduct," but did not warrant dismissal because the breach did not harm the government's investigation or reveal the existence of the sealed complaint to Defendants. United States' Resp. to Defs.' Mot. to Dismiss, R. 60, Page ID #4955–56.

On October 4, 2023, the district court held an in-person hearing concerning Defendants' motion to dismiss and disqualify USN4U. The hearing was attended by counsel for Defendants, USN4U, and the government, and featured testimony from Warren, Ricci, and Cullinan.

Warren testified that he knew that he was not permitted to disclose the complaint to Wolf Creek and its employees while the complaint was sealed. Warren also acknowledged discussing the case with Ricci and telling Ricci that he was not allowed to discuss the case with him. Warren stated that he and Ricci "met at one of the Cuyahoga parks" months after the complaint was filed because Ricci "had information for" Warren concerning the case that Ricci wanted to relay to the law firm representing USN4U. Oct. 4 Hr'g Tr., R. 67, Page ID #5024–25. Warren explained that Ricci gave him documents, which Warren later provided to USN4U's counsel. Warren stated that Ricci also gave him a thumb drive and forwarded emails to Warren concerning "abuse of overtime and work orders that did not exist, work that was being created that was not being done, [and] overbilling to the Government." *Id.* at Page ID #5028, 5041. Warren recalled speaking to Ricci approximately a dozen times, including about "[h]ow things were progressing" with the case against Defendants. *Id.* at Page ID #5026.

Warren also recalled asking Ricci to record Ricci's conversations with fellow Wolf Creek employees pertaining to the case and forwarding Ricci an email from one of USN4U's attorneys in 2019, while the complaint was under seal, instructing Warren not to discuss the case. Warren also testified that he forwarded the email to Cullinan. In response to the district court's questions about the email and the information Warren received from Ricci, Warren stated that he "was not paying attention to all that," prompting the district court to remark that Warren was "not very credible." *Id.* at Page ID #5050. Later in his testimony, Warren was asked by Wolf Creek's counsel about deposition testimony in which Warren stated that he did not know if he forwarded the 2019 email. Asked to verify the deposition testimony, Warren asserted that his deposition and hearing testimony were consistent. The district court then voiced its frustrations with Warren's

response: "No, it is not. All right. Look, this witness is totally incredible, but you can keep asking questions, but I formed a conclusion as to his credibility." *Id.* at Page ID #5055.

Later in the hearing, Warren testified regarding his responses to Defendants' interrogatories. At first, Warren did not recall reviewing the interrogatories. After being directed by the district court to his signed verification on the interrogatories, Warren clarified that he did not "remember reading them all." *Id.* at Page ID #5059–60. Warren also did not recall meeting with his lawyers to prepare the interrogatory responses. Warren explained that "there was confusion with some things, and they were sent to me by UPS, and I resigned them and notarized them and sent them back." *Id.*

When asked about the omission of his discussions with Ricci while the case was under seal from the interrogatory responses, Warren initially acknowledged the omission, but then stated that he did not "know when [he] talked to Ricci." *Id.* at Page ID #5061–62. The district court then reminded Warren of his testimony earlier in the hearing detailing discussions between himself and Ricci about the case while it was under seal. *See id.* at Page ID #5062 ("You told us today that you knew when you talked to [Ricci] while it was under seal because you discussed that with Mr. Ricci, and you knew it, and he knew it, and you told us that today."). Warren later admitted that he had not read the interrogatory responses "in depth," but he did read and understand the portion of the responses attesting to their veracity. *Id.* at Page ID #5063–64. Following additional questions from the district court, Warren stated that he had read his interrogatory responses and that the response concerning his case-related conversations with Ricci was true. However, when asked about the timing of his conversations with Ricci, Warren's responses were equivocal. Warren stated that "[w]e didn't have any doings for a long period of time." *Id.* at Page ID #5065. Warren then disclaimed knowledge of his conversations with Ricci altogether: "I can't tell you if

I talked to him about the case. That's what you are asking me, and I can't tell you that." *Id.* at Page ID #5065–66. In response, the district court stated that "this witness is completely and totally uncredible," and "there is absolutely nothing you can do to change my conclusion." *Id.* at Page ID #5066.

Ricci also testified during the hearing about his conversations with Warren. Ricci recalled Warren informing him of the lawsuit during a phone call between the two in 2017. According to Ricci, in 2017 or the beginning of 2018, Warren requested that Ricci "give him a hand" with the lawsuit by "giv[ing] him some information[] that would help him . . . with this case." *Id.* at Page ID #5083–84. Ricci stated that he obliged and provided documents to Warren "two or three times." *Id.* at Page ID #5085. Ricci also recalled recording at least one conversation among himself and his Wolf Creek coworkers and providing that recording to Warren. In addition, Cullinan, who was in a relationship with Warren from approximately 2016 until 2020, testified about her discussions with Warren concerning the case. Cullinan testified that Warren informed her of the case and "that he was involved," but did not show her any documents concerning the case. *Id.* at Page ID #5114. Cullinan also testified that, at Warren's request, she printed case-related emails forwarded to her by Warren and receipts from purchases made at her employer, Home Depot, by Defendant Anthony Santillo on behalf of Wolf Creek.

At the conclusion of the hearing, the district court denied Defendants' motion to dismiss and held Defendants' motion to disqualify USN4U in abeyance. The district court reiterated that it "did not find [Warren] credible at all on the stand." *Id.* at Page ID #5126. The district court then addressed the government directly:

> [THE COURT:] So Mr. [Assistant United States Attorney] Barker, I want you to think long and hard and directing the Government. The Government thinks this has merit, then take it

over. And if you don't dismiss it—we spent a huge amount of resources, the sealed portion and now the unsealed portion.

It has taken a lot of Court time. I don't know what happened at Wolf Creek. I was not there. The Plaintiff, the Relator feels there was massive fraud and misconduct.

Wolf Creek has denied that anything wrong occurred. Clearly, NASA didn't think there was anything wrong because NASA was aware of this case for several years. NASA was aware of it during the sealed period.

That was the whole point when the Government and NASA were looking into the allegations. People at NASA thought that there was nothing wrong or untoward because they continued [working with] Wolf Creek for several years and, in fact, continued [working with] them up until last week.

So I don't see how Mr. Warren can continue to prosecute this case on behalf of the Government.

So I am directing the Government, I mean, to either — to either take over this case or to conclude it by settlement or dismissal.

Mr. Barker, how long do you need to make that decision?

MR. BARKER: Can we have at least 30 days, your Honor?

THE COURT: I think that's fair. It is a decision of some consequence.

*Id.* at Page ID #5127–28. The district court then suspended the litigation schedule and noted that "[i]f the Government settles or dismisses the case, then there is nothing for anyone to do." *Id.* at Page ID #5129. A memorialization of the hearing issued on the docket later that day noted that the district court "expressed serious concerns about the relator continuing to act as a representative of the U.S. in this lawsuit" and "ordered the U.S. Government to decide whether it would take over the case or move to dismiss it." Mins. of Proceedings dated Oct. 4, 2023.

**Post-hearing Proceedings**

On November 2, 2023, USN4U filed a motion for partial summary judgment. The following day, the government filed a motion to intervene and dismiss the second amended complaint. The government argued that it had good cause to intervene and dismiss the second amended complaint because it "determined that further litigation by relator would result in significant costs and burdens on the government which would not be a judicious use of governmental or judicial resources." United States' Mot. to Intervene & Dismiss Relator's Second Am. Compl., R. 69, Page ID #7253–54. The government further explained that it had "serious concerns about Relator's ability to prove a FCA violation," as many of its allegations were refuted by record evidence and "there are serious issues with [Warren's] credibility that would undermine" USN4U's claims. United States' Mem. of Law in Supp. of Mot. to Intervene, R. 69-1, Page ID #7261. In addition, the government claimed that it would incur a "considerable" additional burden if the case continued regardless of whether it intervened. *Id.* at Page ID #7262. The government also addressed the circumstances surrounding its decision to intervene and move for dismissal, stating that it viewed the district court's "October 4, 2023 Order as requesting that the United States notify the Court as to whether it would consider intervention or dismissal in light of the evidentiary hearing held that day." *Id.* at Page ID #7255 n.1. In doing so, the government "maintain[ed] that the decision of whether to intervene in a *qui tam* action or exercise dismissal authority under 31 U.S.C. § 3730(c)(2)(A) is solely within the authority of the Executive Branch and, specifically, within the discretion of the Department of Justice." *Id.*

On December 7, 2023, the district court granted the government's motion to intervene and dismiss the second amended complaint, without prejudice to the government refiling. At the outset, the district court stated that it "did not, and could not order the U.S. to intervene in the

case." Order, R. 74, Page ID #7329. The district court then explained that the government had good cause to intervene because: (i) "discovery has cast doubt on the Relator's ability to prove any False Claims Act violations against Defendants;" (ii) the government was concerned about Warren's credibility; and (iii) the government "does not want to devote any more resources to the case given the unlikelihood of Relator's success." *Id.* at Page ID #7330–31. The district court also held that the government properly sought to dismiss the second amended complaint because of "a lack of evidence and unlikelihood of success on the merits, plus the burden on the U.S. should this case continue[]." *Id.* at Page ID #7331.

USN4U timely appealed.

## II. DISCUSSION

### A. Standard of Review

We review the district court's order granting the government's motion to dismiss the second amended complaint for abuse of discretion. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 438 (2023). "It is an abuse of discretion for the district court to rely on erroneous findings of fact, apply the wrong legal standard, misapply the correct legal standard, or make a clear error in judgment." *Pedreira v. Sunrise Child.'s Servs., Inc.*, 79 F.4th 741, 746 (6th Cir. 2023) (quoting *Bridgeport Music, Inc. v. Universal-MCA Music Publ'g, Inc.*, 583 F.3d 948, 953 (6th Cir. 2009)).

### B. Analysis

USN4U argues that the district court committed reversible error by (i) ordering the government to intervene in this action, (ii) granting the government's motion to intervene and dismiss, and (iii) not conducting a hearing concerning the government's motion to dismiss. We address each argument in turn but first provide a brief overview of relevant provisions of the FCA.

**False Claims Act**

The FCA "is, at its core, an anti-fraud statute." *United States ex rel. Angelo v. Allstate Ins. Co.*, 106 F.4th 441, 448 (6th Cir. 2024). It "is the most frequently used of a handful of extant laws creating a form of civil action known as *qui tam*." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 (2000). "Because the scope of fraud against the government is much broader than the government's ability to detect it, the *qui tam* provisions allow the government to uncover fraud that it would not otherwise be able to discern." *United States ex rel. Bryant v. Cmty. Health Sys., Inc.*, 24 F.4th 1024, 1030 (6th Cir. 2022) (quoting *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 340 (6th Cir. 2000)).

"The primary goals of the FCA are to incentivize private individuals to bring suit and to alert the government to potential fraud." *State Farm Mut. Auto. Ins. Co. v. Angelo*, 95 F.4th 419, 430 (6th Cir. 2024). Accordingly, "[t]he FCA establishes a scheme that permits either the Attorney General . . . or a private party . . . to initiate a civil action alleging fraud on the Government." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009) (citing 31 U.S.C. § 3730(a), (b)). Private parties initiating such actions are known as relators, *Bryant*, 24 F.4th at 1027, and their *qui tam* lawsuits are brought on behalf of the government, *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1045–46 (6th Cir. 2023) (citing 31 U.S.C. § 3730(b)). To incentivize relators, the FCA allows relators to recover up to thirty percent of the proceeds of the action or settlement, in addition to reasonable expenses, attorneys' fees, and costs. 31 U.S.C. § 3730(d)(2).

As discussed above, relators must file their complaints under seal, provide the government with a copy of the complaint, and disclose to the government all material evidence supporting the allegations. *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 834 n.1 (6th Cir.

2023) (citing 31 U.S.C. § 3730(b)(2)). The government then has sixty days to investigate the relator's claims and determine whether it wants to intervene. *Health Possibilities, P.S.C.*, 207 F.3d at 337 (citing 31 U.S.C. § 3730(b)(2)). Intervening allows the government to "assume[] primary responsibility for prosecuting the action." *Stevens*, 529 U.S. at 769.

The FCA "is designed to allow relators to proceed with a *qui tam* action even after the United States has declined to intervene." *Wolf Creek Fed. Servs., Inc.*, 34 F.4th at 517 (quoting *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 836 (6th Cir. 2018)). "However, given that private opportunism and public good do not always overlap, the FCA provides a number of mechanisms to ensure that the government retains significant authority to regulate *qui tam* litigation." *Health Possibilities, P.S.C.*, 207 F.3d at 340 (citations omitted); *see* 31 U.S.C. § 3730(c)(3)–(4). For example, even when the government declines to intervene, a relator must obtain the consent of the government prior to dismissing an FCA claim. *Angelo*, 95 F.4th at 429–30. In addition, "after turning down the opportunity to intervene, the government may still intervene later upon a showing of good cause." *Taxpayers Against Fraud*, 41 F.3d at 1041; *see* 31 U.S.C. § 3730(c)(3). Relevant to this appeal, following a showing of good cause, the government may "subsequently dismiss a case over the relators' objections." *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 845 (6th Cir. 2020) (quoting *United States ex rel. Gilbert v. Va. Coll., LLC*, 305 F. Supp. 3d 1315, 1324 (N.D. Ala. 2018)). That dismissal may occur "whenever (whether during the seal period or later) [the government] has intervened." *Polansky*, 599 U.S. at 430.

**Separation of Powers**

USN4U argues that the district court violated the separation of powers doctrine by ordering the government to intervene in this case. In USN4U's view, the district court gave the government

"no option to continue the status quo and remain non-intervened." Appellant's Br., ECF No. 35, 28. In doing so, according to USN4U, the district court contravened the FCA's private enforcement provisions by forcing the government to assume litigation costs and detracting from the government's other enforcement efforts. However, USN4U's arguments misconstrue the effect of the district court's actions.

"The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch." *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 163–64 (2d Cir. 2001); *see also Patchak v. Zinke*, 583 U.S. 244, 250 (2018). Accordingly, "intervention by the court in the internal affairs of the Justice Department would clearly constitute a violation of the Separation of Powers Doctrine." *United States v. Renfro*, 620 F.2d 569, 574 (6th Cir. 1980). However, the record below does not indicate any such intrusion into the government's decision making. In moving to intervene and dismiss the second amended complaint in the instant case, the government maintained that the Executive Branch, acting through the Justice Department, has "sole[] . . . authority" to intervene in a *qui tam* action or exercise its right to dismissal pursuant to 31 U.S.C. § 3730(c)(2)(A). United States' Mem. of Law in Supp. of Mot. to Intervene at Page ID #7255 n.1. The government understood the district court to be "requesting . . . notif[ication] . . . as to whether [the government] would consider intervention or dismissal in light of the evidentiary hearing held that day." *Id.* The district court similarly acknowledged in its order dismissing the action that it lacked the power to compel the government to intervene. While USN4U's contentions about the district court's wording of its request to the government concerning potential intervention are well taken, we find no reason to impart meaning to the district court's actions which the government itself clearly did not glean from the district court's directive at the conclusion of the October 4, 2023, hearing. Courts retain

"'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). Mindful of that power and the government's assertion of independence in moving to dismiss, we find that the district court properly "maintain[ed] the primacy of the Executive Branch in prosecuting false-claims actions" and did not violate the separation of powers doctrine. *Taxpayers Against Fraud*, 41 F.3d at 1041.

### Motion to Intervene and Dismiss

USN4U next argues that the district court erred in granting the government's motion to intervene and dismiss. USN4U contends that the government did not establish good cause to intervene because the government's cited reasons for intervention "are present in every single lawsuit filed." Appellant's Br. at 51. In addition, with respect to its grant of the government's motion to dismiss, USN4U argues that the district court erred by considering the government's expected costs from intervening rather than the government's expected costs if it had not intervened in this case.

USN4U too narrowly construes the government's right to intervene in and dismiss *qui tam* actions. As the Third Circuit explained in *Polansky v. Executive Health Resources Inc.*, "showing 'good cause' is neither a burdensome nor unfamiliar obligation," but rather "'a uniquely flexible and capacious concept,' meaning simply a 'legally sufficient reason.'" 17 F.4th 376, 387 (3d Cir. 2021) (quoting *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 846 (7th Cir. 2020)). The government provided such legally sufficient reasons below. Namely, the government posited as reasons for good cause to intervene that it would incur significant monitoring costs if this litigation continued and that it doubted that USN4U could prove its FCA claims given the

record developed during discovery. In response, USN4U argues that "[t]he United States' *de minimus* [sic] 'monitoring costs' justification should be weighed against the hundreds of hours and tens of thousands of dollars in expert costs Relator incurred to prosecute this case." Appellant's Br. at 39. However, no such weighing is mandated by the FCA, which "is not designed to serve the parochial interests of relators, but to vindicate civic interests in avoiding fraud against public monies." *Health Possibilities, P.S.C.*, 207 F.3d at 340. We find no abuse of discretion in the district court's acceptance of the government's assessment that the continued prosecution of this action would not serve this purpose.

USN4U's arguments concerning dismissal are similarly unavailing. The government's motion to dismiss is subject to Rule 41 of the Federal Rules of Civil Procedure. *Polansky*, 599 U.S. at 435. "Rule 41 provides two main mechanisms by which a plaintiff may voluntarily dismiss its case." *Wellfount, Corp. v. Hennis Care Ctr. of Bolivar, Inc.*, 951 F.3d 769, 772 (6th Cir. 2020). In the mechanism relevant to this appeal, "if an opposing party has served an answer or a motion for summary judgment, . . . 'an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.'" *Id.* (quoting Fed. R. Civ. P. 41(a)(2)). The determination of whether dismissal is appropriate in such a situation "is within the sound discretion of the district court." *Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994). The Supreme Court has stated that the government's motions to dismiss in FCA actions "will satisfy Rule 41 in all but the most exceptional cases." *Polansky*, 599 U.S. at 437. Consequently, "[i]f the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion. And that is so even if the relator presents a credible assessment to the contrary." *Id.* at 438. In this case, the government offered the same reasons for dismissing this action as it did for intervening. The government cited the strain on its resources

should this action continue, the tenuous nature of USN4U's claims considering the available record evidence, and the litigation challenges posed by Warren's credibility. While USN4U attempts to refute these assertions, it does little to refute the reasonableness of the government's decision to seek dismissal considering these anticipated litigation challenges. Accordingly, USN4U has failed to demonstrate an "exceptional case[]" sufficient to overcome Rule 41's permissive scope. *Id.* at 437.

## Hearing Requirement

USN4U also argues that the district court erred by not holding a hearing concerning the government's motion to dismiss. USN4U contends that a hearing would have allowed it to properly raise issues concerning the considerations motivating the government's motion and the adequacy of the government's investigation of USN4U's FCA claims. However, USN4U was not entitled to an in-person hearing prior to the district court granting the government's motion to dismiss.

The FCA permits the government to dismiss *qui tam* actions "notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A); *see also Polansky*, 599 U.S. at 436 ("The FCA requires notice and an opportunity for a hearing before a Subparagraph (2)(A) dismissal can take place."). USN4U does not dispute that it had ample notice of the government's motion to dismiss. USN4U also does not dispute that it was able to contest the government's motion through written briefing before the district court. This briefing was sufficient to satisfy § 3730(c)(2)(A)'s hearing requirement. In reaching this conclusion, we join the two other courts of appeals that have recently considered this question. *See United States ex rel. Doe v. Credit Suisse AG*, 117 F.4th 155, 161

(4th Cir. 2024) ("The district court satisfied the 'hearing' requirement by considering the parties' written submissions . . . ."); *Brutus Trading, LLC v. Standard Chartered Bank*, No. 20-2578, 2023 WL 5344973, at *2 (2d Cir. Aug. 21, 2023) ("Here, the district court met the hearing requirement by carefully considering the parties' written submissions."). USN4U itself concedes that a district court's consideration of the parties' motions to dismiss briefing "could satisfy the . . . § 3730(c)(2)(A) hearing requirement." Appellant's Br. at 40.

USN4U resists this conclusion by contending, without further elaboration, that "an in-person hearing would have given Relator an opportunity to show: (1) the United States did not adequately investigate Relator's claims, and (2) the United States' motion to dismiss was based on improper considerations." *Id.* at 41. But despite being fully aware of the government's reasons for seeking to dismiss the case when it prepared its briefing, *see Borzilleri v. Bayer Healthcare Pharmaceuticals, Inc.*, 24 F.4th 32, 42 (1st Cir. 2022) ("Th[e] purpose [of the hearing requirement] cannot be achieved if the relator is unaware of the government's reasons for dismissal and, thus, is unable to challenge them."), USN4U has not identified any specific evidence or arguments it was unable to raise because the district court did not hold an in-person hearing. There is therefore no reason to believe that not holding an in-person hearing prejudiced USN4U. Accordingly, the district court's consideration of the parties' briefs, as evidenced by the discussion in its order dismissing the case, satisfied the § 3730(c)(2)(A) hearing requirement.

## III. CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.