RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA *ex rel.* USN4U, LLC,

　　　　　　　　　　　　　　*Relator-Appellant*,

　　　*v.*

WOLF CREEK FEDERAL SERVICES, INC.; ANTHONY
SANTILLO; CHRISTOPHER LOGAN; TIMOTHY TESCH,

　　　　　　　　　　　　　　*Defendants-Appellees*.

┐
│
│
│
├─  No. 20-4246
│
│
│
┘

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:17-cv-00558—Dan A. Polster, District Judge.

Argued: June 9, 2021

Decided and Filed: May 16, 2022

Before: ROGERS, WHITE, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Logan Trombley, THE LAW OFFICES OF WARNER MENDENHALL, Akron,
Ohio, for Appellant. Philip S. Kushner, KUSHNER & HAMED CO., L.P.A., Cleveland, Ohio,
for Appellees. **ON AMICUS BRIEF:** Charles W. Scarborough, Joshua Dos Santos, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF
AND RESPONSE TO AMICUS:** Logan Trombley, THE LAW OFFICES OF WARNER
MENDENHALL, Akron, Ohio, for Appellant. Philip S. Kushner, Brandon Mordue, KUSHNER
& HAMED CO., L.P.A., Cleveland, Ohio, for Appellees.

　　　ROGERS, J., delivered the opinion of the court in which WHITE and MURPHY, JJ.,
joined. MURPHY, J. (pp. 14–19), delivered a separate concurring opinion.

―――――――――――

**OPINION**

―――――――――――

ROGERS, Circuit Judge.   In this *qui tam* action under the False Claims Act, relator USN4U alleges that Wolf Creek Federal Services and several of its employees submitted falsely inflated project estimates to the National Aeronautics and Space Administration (NASA) for facilities maintenance projects to be performed by Wolf Creek, resulting in the negotiation of fraudulently induced, exorbitant contract prices.  Relying in part on NASA's subsequent decision to pay the invoices and continue to contract with Wolf Creek, and on the Government's decision not to intervene in USN4U's claim, the district court dismissed the suit for failure to allege that Wolf Creek's work order proposals were materially false or caused NASA to pay the allegedly exorbitant prices.   USN4U's amended complaint, however, adequately alleged fraud, notwithstanding NASA's later contractual decisions and the fact that the Government declined to intervene.

Wolf Creek is a federal contractor that, among other things, provides facilities management and maintenance services.  In September 2013, NASA awarded Wolf Creek a contract to operate and maintain the facilities at the NASA Glenn Research Center.  The alleged false claims in this case occurred under the indefinite-delivery-indefinite-quantity ("IDIQ") portion of the contract.  The IDIQ portion of the contract allows NASA to approve specific projects for Wolf Creek to perform on a firm-fixed-price basis.  Under this process, NASA receives a work request from a NASA employee and assigns the work request to the appropriate contract.  If Wolf Creek is chosen to complete the project, the computerized maintenance management system produces a work order, which is a formal document directing Wolf Creek to perform the tasks in the work request.  After Wolf Creek receives a work order, it writes a proposal that includes the schedule of the project and the total cost of labor and materials. NASA then reviews the proposal and is able to negotiate a final price and schedule before awarding the firm-fixed-price contract.  A firm-fixed-price contract is based on "a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  48 C.F.R. § 16.202-1.  Once the final price is agreed upon, Wolf Creek can begin

performing the requested task, and—with limited exceptions—it must ensure that all invoices sent to NASA match the agreed-upon final price.

An individual who suspected Wolf Creek of wrongdoing created the limited liability company USN4U "to protect his identity from retaliation from Wolf Creek management or union employees." USN4U alleges that Wolf Creek employees falsely inflated labor cost estimates in proposals sent to NASA, and that NASA "agreed to the falsified firm-fixed price for the work order relying on the inflated estimated labor hours." Wolf Creek then sent NASA invoices for the falsely inflated amount, so USN4U alleges that "[t]he Government paid Wolf Creek and its union employees for labor not actually performed." USN4U describes several specific projects that it alleges are representative examples of the fraudulent scheme. First, USN4U alleges that NASA awarded Wolf Creek a $10,857 contract to renovate a lab based on falsified labor estimates of 80 carpenter hours, 20 HVAC mechanic hours, and 16 plumber hours. USN4U claims that the lab renovation required only 7 carpenter hours, 6 HVAC mechanic hours, and no plumber work at all. Second, USN4U asserts that NASA awarded Wolf Creek a $22,964 contract to renovate the hallways of a building. Wolf Creek stated that the project would take 150 carpenter hours and 150 painter overtime hours. According to USN4U, however, this was a relatively straightforward project that involved removing and replacing room number signs and painting two floors' hallways, requiring only a fraction of the estimated labor hours. Third, USN4U alleges that Wolf Creek vastly overstated the labor hours required to paint several rooms. For example, Wolf Creek estimated a labor cost of $9,964 for a painting job that USN4U claims would typically be completed for a labor cost of $152. Fourth, USN4U cites two plumbing jobs—"[c]onnecting a new sink to water lines" and "[i]nstalling a copper line into a room"—that it asserts would each require "less than a day of work for one plumber." Wolf Creek, however, told NASA that the plumbing jobs would require $9,940 and $12,043 in labor costs, respectively.

USN4U asserts that Wolf Creek had a deliberate process for carrying out the fraudulent scheme. When Wolf Creek performed NASA projects, work group leads allegedly instructed certain "participating union employee[s]" to falsely report their labor hours to "justify the inflated [labor] estimate." The software used to track labor hours "has no mechanism to verify

whether an employee worked on a work order, or even showed up for work," and work group leads did not have to verify the labor hours reported by their subordinates. USN4U identifies several Wolf Creek employees who were allegedly active members of the fraudulent scheme: Timothy Tesch and Christopher Logan, who served as project managers at various times during the contract's execution; and Anthony Santillo, a work group lead for the carpentry department. USN4U also alleges that about one third of union employees in the carpentry, electrical, security systems, HVAC, and plumbing departments participated in the scheme by falsely reporting labor hours in the software system and receiving higher wages as a result. Tesch and Logan allegedly "had a financial incentive to deliberately ignore the fraud scheme" because Wolf Creek received management fees equal to ten percent of the labor costs for each project. USN4U claims that the scheme also benefited Logan's sons, who were union employees at Wolf Creek despite their lack of required qualifications. According to USN4U, Santillo and the complicit union employees "protect Logan's sons in the union in exchange for Logan's deliberate ignorance of the fraud scheme." USN4U also claims that several Wolf Creek employees discussed the fraudulent scheme in a recorded conversation. Santillo allegedly stated that he "upped" an estimate "like [he] always do[es]," and another employee said that the employee "pump[s] out estimates" to "[i]nundate the customer with the quotes."

USN4U sued Wolf Creek and several of its employees under the False Claims Act ("FCA") in the district court below, and the United States declined to intervene in the action. The defendants filed a motion to dismiss for failure to state a claim upon which relief may be granted, arguing that the estimates and project proposals were not "claims" for FCA purposes and questioning whether the specific examples of alleged fraud supported the general claims made by USN4U. After USN4U amended its complaint, the defendants filed a second motion to dismiss, repeating their argument that quotes were not "claims" for purposes of the FCA and further arguing that invoices were not "false" if they matched the quoted amount.

In its amended complaint, USN4U alleged that Wolf Creek and several employees submitted false quotes and invoices to NASA for firm-fixed-price projects. According to USN4U, one Wolf Creek employee "purposefully inflated the estimated labor hours" to increase the quoted price in the work proposals submitted to NASA. USN4U's amended complaint

included several specific quotes that Wolf Creek allegedly submitted to NASA that substantially overestimated the labor hours required for projects. USN4U also named employees who allegedly self-reported that they worked more hours on projects than they actually did. USN4U's amended complaint includes a transcript of a recorded conversation in which several Wolf Creek employees allegedly discussed the fraudulent scheme. The allegations at issue at this stage of the litigation were not that the invoices exceeded the agreed-upon estimates, but instead that NASA agreed to the contracts based on fraudulently inflated estimates regarding the work to be done.

The district court granted the defendants' motion to dismiss and denied USN4U's motion to file a second amended complaint.[1] The court held that the work order proposals submitted to NASA, which contained the quoted price, were not "claims" under the FCA. The court reasoned that because the work proposals were merely estimates, they did not fall within the FCA's definition of a claim as "any request or demand . . . for money." The court thus concluded that "only an invoice can be a claim under the FCA in this case." The court held that USN4U failed to present evidence of falsity because USN4U only used "industry standards" as a comparison to demonstrate that Wolf Creek's quotes were inflated. Finally, the court held that USN4U did not state a claim for fraud in the inducement because it did not sufficiently plead that the inflated quotes "were material and caused the Government to pay more money to Wolf Creek than it would have paid had it known the true labor costs." The court concluded that the fact that NASA kept contracting with Wolf Creek after NASA became aware of the fraud allegations was "highly relevant to the issue of materiality." The court added that "[t]his is a logical explanation for why the Government declined to intervene in this case."

USN4U appeals. Following oral argument, we requested the views of the United States regarding the legal issues presented on appeal. The United States filed a brief in response, and the parties have replied to that response.

---

[1]The second amended complaint added the invoices that corresponded with the allegedly false estimates.

USN4U has sufficiently alleged a fraudulent inducement claim, and such claims are permitted under the FCA. The FCA creates liability not only for "any person who . . . knowingly presents . . . a false or fraudulent claim for payment or approval" to the federal government, but also for one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). In *United States ex rel. Marcus v. He*ss, the Supreme Court recognized that FCA liability can be based on a fraudulent premise that caused the United States to enter into a contract. *See* 317 U.S. 537, 543-44 (1943). We later characterized *Hess* as "establish[ing] that an invoice, which itself does not contain a falsity, may supply the premise for a false claim if submitted in connection with a fraudulently obtained contract." *United States v. United Techs. Corp.*, 626 F.3d 313, 319 (6th Cir. 2010); *see also United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326-27 (D.C. Cir. 2005). Consequently, we held in *United Technologies* that a company was subject to FCA liability for using false cost estimates to fraudulently induce the United States to enter into a contract. *See* 626 F.3d at 320-21. USN4U has similarly stated a fraudulent inducement claim based on its allegations that Wolf Creek falsely inflated cost estimates in its work order proposals and thus induced NASA to agree to contracts at that price point.

***FCA Pleading Standard***. Notwithstanding the arguments of Wolf Creek, the required elements of a fraudulent inducement claim are stated with sufficient particularity to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). That rule requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In the FCA context, as properly stated by the district court, a plaintiff must allege that false statements were made with the requisite scienter, materiality, and causation. *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 830 (6th Cir. 2018); *see also United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016). USN4U argues that Wolf Creek's allegedly inflated cost estimates were materially false statements that caused NASA to eventually pay Wolf Creek the falsely quoted amount. As explained below, the specific allegations of fraud in USN4U's amended complaint are detailed enough to meet the Rule 9(b) particularity requirement.

The amended complaint details four specific allegations of fraud, thus meeting the requirement that the relator provide examples of the fraudulent scheme. When a relator "alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide[ ] examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *Prather*, 892 F.3d at 830 (quoting *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444-45 (6th Cir. 2008) (alteration in original)). First, USN4U describes a falsely inflated work order proposal to renovate the "GVIS Lab." The proposal that Wolf Creek submitted to NASA stated that the project would take 80 carpenter hours, 20 HVAC mechanic hours, and 16 plumber hours. USN4U, however, alleges that the project required only 7 carpenter hours, 6 HVAC mechanic hours, and zero plumber hours.[2] Second, the amended complaint details an overpriced work order proposal to paint and replace signs in the hallways of Building 142. Wolf Creek's proposal informed NASA that the project would take about 150 carpenter hours "to remove and replace room number signs," and 150 painter hours to "patch and paint the first and second floor hallways." But USN4U alleges that based on the length of Building 142 and the width of a standard hallway, a painter working at the industry standard pace could complete the painting project in 9 hours. USN4U claims that NASA's own documents "show this work order was completed in one day," contrary to Wolf Creek's inflated estimates and the "false overtime hours" reported by Wolf Creek. Third, USN4U describes several instances in which NASA substantially overpaid Wolf Creek for small painting jobs. For example, Wolf Creek estimated that painting one room would cost $9,964 in labor costs, while USN4U alleges that it would cost $152 in labor hours under industry standards. Fourth, USN4U outlines two instances in which Wolf Creek estimated labor

---

[2]The district court emphasized USN4U's apparent misstatement that "[t]he performance start and end date was September 15, 2018." In reality, the records attached to the amended complaint as Exhibit 4 indicate that the start date of the project was July 31, 2018, and the end date was September 15, 2018. *See* Exhibit 4 at 4. The district court thus concluded that it "took Wolf Creek more than six weeks to complete the job." There is no indication, however, that the start and end dates in Exhibit 4 represent the total time that Wolf Creek worked on the project. In fact, almost all of the over two hundred entries list a "Performance Start Date" that is the same as the "Award Date," so the "Performance Start Date" could instead represent the day when the project was approved to begin, not the day that work actually began. Because the court could have reasonably drawn this inference in either direction, it should not have drawn it against USN4U. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016).

costs of nearly $10,000 for simple plumbing jobs that USN4U claims would take "less than a day of work for one plumber."

Wolf Creek argues that USN4U's examples of alleged fraud are insufficient, but such examples are sufficiently particular to meet the requirements of Rule 9(b). If a relator alleges a widespread fraud, then "a single adequately pled claim of this nature would allow relators to satisfy Rule 9(b)'s pleading requirement and proceed to discovery on the entire scheme." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 915 (6th Cir. 2017). As stated above, USN4U provided several specific examples of how Wolf Creek allegedly overbilled NASA by inflating cost estimates.[3] Because USN4U has generally stated its FCA claim with particularity, we proceed to determine whether USN4U also sufficiently alleged falsity, scienter, materiality, and causation.

*Falsity*. USN4U has sufficiently alleged that Wolf Creek made false statements to NASA when it submitted inflated cost estimates. The relevant provision of the FCA creates liability for a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Wolf Creek's argument that the first example of allegedly fraudulent billing was in fact an accurate representation of the work is addressed above. *See supra* note 2. With respect to the second, third, and fourth examples, USN4U's reliance on industry standards in this case is not presumptively insufficient, as the district court concluded. At the pleading stage, it is sufficient that USN4U set forth a factual basis for its allegations by pointing to plausible industry standards and alleging that Wolf Creek's labor estimates were dramatically higher than those standards.

In addition, some of the second, third, and fourth examples were supported by evidence other than industry standards. USN4U alleged additional facts that, from a common-sense perspective, support the assertion that Wolf Creek falsified statements to NASA. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v.*

---

[3]The district court's analysis relied in part on the fact that USN4U had not provided the invoices that corresponded to each allegedly false estimate submitted by Wolf Creek. USN4U resolved that issue, however, when it included specific invoices in its second amended complaint.

*Iqbal*, 556 U.S. 662, 679 (2009).  Allegations in the amended complaint point to the fact that Wolf Creek significantly and repeatedly overcharged NASA.  USN4U attached an exhibit to its amended complaint that includes a timesheet from September 2016 to February 2017 indicating "a large disparity in double time hours and compensation between the union employees who participated in the fraud scheme and those who did not."  There was one incident in which Wolf Creek quoted NASA for the work of a plumber when a "[p]lumber ha[d] no role whatsoever in [the] project."  Wolf Creek also sent NASA labor quotes of about $10,000 for simple projects such as installing a sink to water lines and installing a copper line in one room.  As discussed further below, moreover, USN4U has a recording of a conversation in which Wolf Creek employees appear to discuss their false estimates.  Taken as a whole, USN4U has sufficiently pled falsity.

*Scienter*.  USN4U sufficiently pled scienter by alleging that Wolf Creek knew that it was making false representations to NASA.  An FCA claim requires showing that the defendant acted "knowingly," meaning that the defendant had "actual knowledge of the information" or acted in "deliberate ignorance" or "reckless disregard" of whether the statement was false.  *See* 31 U.S.C. § 3729(a)(1), (b)(1)(A).  The standard "does not require 'proof of specific intent to defraud' . . . [a]nd, at the motion-to-dismiss stage, a plaintiff need only allege the scienter element generally." *Prather*, 892 F.3d at 837 (quoting 31 U.S.C. § 3729(b)(1)(B)).  In *Prather*, we held that the relator met the scienter requirement by alleging that the defendant was dismissive of compliance concerns, instructed employees to skim important documents, and sent an email implying that the defendant was aware of potential compliance issues.  *See id*. at 837-38.  Similarly, in this case USN4U has a recorded conversation in which Wolf Creek employees allegedly discussed their knowledge of the falsely inflated cost estimates and labor hours.  Santillo, a leader in the carpentry department, allegedly stated "[t]he original estimate that they gave me for hours, they told me they needed about 130 hours of overtime.  I upped it like I always do to 164 hrs.  They put 409 hours of time and a half and double time."  In the same conversation, a union member who allegedly participated in the fraud said:

I came back and we started chewing up what you guys had. It was going away so I got nervous and had no intentions of working 40 hrs when I came back. So then I got crazy and started pumping out estimates. And now it[']s, if I stay at the rate that I am at right now we will never run out. So the key is to just have it flooded. Inundate the customer with the quotes. So that's kind of like darts ya know. It's got to land when money shows up.

Such statements, along with the other evidence of falsity discussed above, are sufficient to meet the scienter requirement at the pleading stage.

*Materiality*. USN4U sufficiently pled that Wolf Creek's inflated cost estimates were material. The FCA "defines 'material' as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Prather*, 892 F.3d at 831 (quoting 31 U.S.C. § 3729(b)(4)). "A false statement is material if it has 'the objective, natural tendency to influence a government decision maker.'" *United States ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*, 600 F. App'x 969, 973 (6th Cir. 2015) (quoting *United*, 626 F.3d at 321). Although "[t]he materiality standard is demanding," *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016), courts may examine a variety of factors, with no one factor being dispositive, when determining whether allegations of fraud are material. *See id.* at 194-96; *see also Prather*, 892 F.3d at 831. The circumstances here indicate that Wolf Creek's falsely inflated estimates could have had the tendency to influence NASA's contracting decisions. Rather than conduct its own independent research into the cost of a potential project and then offer to pay Wolf Creek that amount, NASA instead asked Wolf Creek for an estimate. When NASA awarded Wolf Creek a project, it always did so for the amount stated in Wolf Creek's estimate. While it is possible, as Wolf Creek suggests, that NASA's faith in Wolf Creek's estimates came from its own careful research and consideration of Wolf Creek's proposals, it is also plausible that NASA trusted and relied exclusively upon Wolf Creek's estimates, and that NASA ultimately paid Wolf Creek based on its induced belief that the quoted prices were reasonably accurate.

Wolf Creek's falsely inflated cost estimates could thus create fraudulent inducement liability under the FCA, because USN4U alleges facts sufficient to show that the inflated estimates would have a tendency to influence NASA's decisions to award Wolf Creek the projects at those higher prices rather than lower ones. In *United Technologies*, we held that a

contractor violated the FCA by submitting proposals to the Air Force that included false statements with respect to pricing and cost figures in order to "drive up the prices for split-award contracts and to discourage the Air Force from splitting up the work." *See* 626 F.3d at 317. We concluded that the false statements in the proposal "had the potential to influence the government's decision to sign the contract and thus to pay the invoices under it." *See id*. at 320. Similarly, in this case Wolf Creek's falsely inflated estimates could have influenced NASA's decision to award Wolf Creek the contract at the estimated prices and to eventually pay Wolf Creek those amounts.

The Government's decision to continue contracting with a party after discovering alleged fraud is not "dispositive" of the materiality inquiry. *See ManTech*, 600 F. App'x at 977. There are a variety of factors unrelated to the materiality of the allegations that could cause the Government to continue contracting with a party after the Government becomes aware of alleged fraud. *See id*. at 977-78. For one, there is a difference between alleged fraud and actual fraud, and the Government may not want to prematurely end a relationship with a contractor over unproven allegations. In addition, the Government may not have other feasible procurement options and thus may be forced to rely on the contractor for essential goods or services even after becoming aware of a plausible fraud claim. As we explained in *ManTech*, there could be a lack of other suppliers, "[t]he government may make operational changes or investments in reliance on the agreement," or there could be high "costs associated with implementing another bidding process at the last minute." *Id.* at 977. In *United States ex rel. Harrison v. Westinghouse Savannah River Co*., the Fourth Circuit also set forth reasons why "a government entity might choose to continue funding the contract despite earlier wrongdoing by the contractor." 352 F.3d 908, 917 (4th Cir. 2003).

It is true that in the context of regulatory non-compliance, the Supreme Court has stated that "if the Government pays a particular claim in full despite its *actual* knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Universal Health*, 579 U.S. at 195 (emphasis added). But regulatory non-compliance—a contractor's failure to follow underlying government regulations regarding the product or service it sells to the government—is fundamentally different from gross overpayment

for labor that was not actually performed. Regulatory noncompliance can be "minor or insubstantial" in some cases, while gross overcharging for work not done goes inherently "to the very essence of the bargain," to use the words of the Supreme Court in the materiality context. *See id*. at 194, 194 n.5 (quotation omitted). Wolf Creek's allegedly false cost estimates that drastically overstated the required labor hours are in the latter category. In any event, the facts alleged in this case do not indicate that NASA had "actual knowledge" that Wolf Creek did in fact submit falsely inflated quotes. Instead, the alleged facts show only that USN4U informed NASA of its allegations, not that NASA necessarily believed the allegations to be true.

Moreover, the Government's decision not to intervene in a particular FCA case does not imply that the claim is not material. We flatly rejected such an argument in *Prather*. As we noted in that case, "the False Claims Act is designed to allow relators to proceed with a *qui tam* action even after the United States has declined to intervene." 892 F.3d at 836 (citing 31 U.S.C. § 3730(d)(2)). The Supreme Court has decided a False Claims Act case in which the Government declined to intervene, and the Court "did not mention this as a relevant factor in its materiality analysis." *See id*. (citing *Universal Health*, 579 U.S. at 185). Consequently, the United States' decision not to intervene in a particular case is not evidence of a lack of materiality. The very fact that the FCA allows private relators to enforce the Act, *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 340 (6th Cir. 2000), implies a recognition that the Government may have limited resources or may choose to focus its enforcement efforts elsewhere, *see Thompson v. Quorum Health Res., LLC*, 485 F. App'x 783, 790 (6th Cir. 2012).

*Causation*. Finally, USN4U sufficiently pled causation.[4] The FCA requires a relator to show "that the defendant submitted [the false statement] to the U.S. government causing it to pay the claim." *Prather*, 892 F.3d at 830. USN4U has alleged facts sufficient at the pleading stage to create a causal link between Wolf Creek's falsely inflated cost estimates and NASA's eventual payment of the quoted amounts. In *United Technologies*, we concluded that "[f]alse statements underlying multi-year contracts generate a stream of related invoices and cause the government

---

[4]Wolf Creek points out that USN4U does not address causation apart from its materiality argument, but this reflects that the district court did not address causation as an issue apart from its materiality analysis. USN4U responded to the purportedly independent causation argument in its reply brief.

to pay all of the invoices related to the contract." 626 F.3d at 320. We have also stated that whether the Government relied on the allegedly false statements is relevant to the causation inquiry. *United States v. United Techs. Corp.*, 782 F.3d 718, 727-28 (6th Cir. 2015). In this case, NASA asked Wolf Creek for estimates and when it awarded Wolf Creek the contracts, NASA always awarded the contracts for the quoted amount, which could indicate that NASA trusted and relied upon the purported accuracy of Wolf Creek's estimates when it entered into the contracts at the quoted prices. Furthermore, NASA plausibly would not have agreed to pay Wolf Creek the quoted amount if NASA knew that it was being grossly overcharged, which is additional support for the existence of a causal link between Wolf Creek's false estimates and NASA's reliance on those estimates. USN4U has thus sufficiently alleged that Wolf Creek's false estimates caused NASA to contract with Wolf Creek at the falsely inflated prices.

USN4U has accordingly stated a plausible claim under the FCA. We of course take no position on whether, following appropriate discovery, summary judgment would be warranted for failing to show a genuine issue of material fact. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

————————————

**CONCURRENCE**

————————————

MURPHY, Circuit Judge, concurring.  We decide this appeal in the narrow manner that the parties have presented it to us.  Wolf Creek Federal Services challenges USN4U's complaint under the False Claims Act on grounds that are largely ill-suited for a motion to dismiss.  Did NASA pay Wolf Creek in subjective reliance on Wolf Creek's allegedly false statements?  What should we make of NASA's continued payments after it learned of USN4U's allegations?  How long did Wolf Creek take to finish specific projects?  The court properly declines to affirm the dismissal of USN4U's complaint on these fact-dependent grounds.  But, as the court adds, our reversal says nothing about whether USN4U will be able to prove its claims down the road.  I write this concurrence because the parties seem to have overlooked common-law principles that may provide important guidance on whether USN4U can do so.  After all, when a statute like the False Claims Act uses common-law terms, we presume that the terms come with their common-law meanings.  *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 (2016).

Recall that Wolf Creek entered into so-called "firm-fixed-price" contracts with NASA to perform maintenance and repair work at the Glenn Research Center.  A basic understanding of these contracts is critical to the legal issues.  NASA would regularly ask Wolf Creek to undertake specific projects at this facility—such as painting a hallway or remodeling an office.  But NASA did not want to pay Wolf Creek employees an hourly rate for each project.  Why?  Because NASA would then be on the hook for cost overruns.  By agreeing to a fixed price upfront, NASA shifted the risk to Wolf Creek that a project might cost more than expected.  *See* 48 C.F.R. § 16.202-1.  To agree on a project's price at the outset, though, the parties had to predict Wolf Creek's estimated costs before they would learn Wolf Creek's actual costs once it completed the project.  Wolf Creek would start the negotiations over this fixed price by submitting to NASA a work-order proposal that provided its opinion of the projected costs.  For labor expenses, Wolf Creek would identify the expected number of hours for different employees (e.g., carpenters, mechanics, or plumbers) and multiply those hours by the employees'

anticipated hourly wages. NASA would then review Wolf Creek's proposal, and the parties would negotiate a price. Once the parties reached a deal, Wolf Creek could commence the work.

USN4U claims that Wolf Creek employees routinely provided NASA with work-order proposals that grossly overestimated the labor hours required for a project in order to increase the fixed price that NASA would later agree to pay. But I fail to see how Wolf Creek's *estimate* of a project's expected labor hours would qualify as "false" simply because the project's *actual* hours turned out to be lower (or higher, for that matter). The complaint's allegations help prove my point. As one example of the alleged fraud, the complaint asserts that Wolf Creek's proposal for a lab project listed 16 hours of plumbing work at a cost of $885.75. According to the complaint, the project ended up not requiring a plumber at all. Yet what if the estimate was based (and priced) on, say, a 25% chance that the job *might* require a plumber for potentially hidden pipes? Nobody would call this estimate "false" simply because the contingent risk did not materialize. As a prediction of a future event, the estimate did not express a verifiably "true or false" statement. Dan B. Dobbs et al., *Dobbs' Law of Torts* § 678, at 689–92 (2d ed. 2011). Without more, therefore, the fact that the estimates in a work-order proposal turned out to be wrong would not make them "false."

What more is required? These work-order estimates look a lot like statements of opinion rather than of fact. If so, the proper legal framework becomes clear. The common law of fraud long distinguished between these two types of statements, taking a dim view of the circumstances in which mere opinions could support fraud claims. *See* Thomas M. Cooley, *A Treatise on the Law of Torts* 483–85 (1879); *see, e.g.*, *Gordon v. Butler*, 105 U.S. 553, 557 (1881); *Deming v. Darling*, 20 N.E. 107, 108–09 (Mass. 1889) (Holmes, J.); *Rendell v. Scott*, 11 P. 779, 780 (Cal. 1886) (per curiam). To understand the difference between statements of opinion and fact, consider two variations of the complaint's allegations about Wolf Creek's plumbing work. In the first variation, a company claims that its plumber had worked 10 hours in the *past* on a completed project. This assertion would make a statement about "a thing done or existing"—that is, a statement of fact. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (quoting *Webster's New International Dictionary* 782 (1927)). In the second variation, a company claims that a *future* project would require its

plumber to work 10 hours.  This assertion would make a statement about a "belief" of future events that "does not imply" "certainty"—that is, a statement of opinion.  *Id.* (quoting *Webster's*, *supra*, at 1509); *see also* William L. Prosser, *Handbook of the Law of Torts* 763 (1941); *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007).

I see at least two ways in which common-law courts treated the one statement (of fact) differently from the other (of opinion).  *See Omnicare*, 575 U.S. at 182–95; Restatement (Second) of Torts §§ 538A, 539, 542 (Am. L. Inst. 1977).  For starters, a fraud plaintiff needed to show different things to establish the "false" nature of a fact as compared to an opinion.  *See Omnicare*, 575 U.S. at 183–86.  Consider the two plumbing hypotheticals again.  If the completed project did not involve a plumber, a misrepresentation that the plumber had worked 10 hours could alone support a fraud claim (as long as fraud's other elements were met).  *See* Restatement (Second) of Torts § 525 & cmt. b.  If, by contrast, a future project did not end up needing a plumber, a mistaken opinion that it would require 10 hours of future work could not support such a claim by itself.  Rather, a plaintiff would have to show that the company's *belief* was false—that is, that the company did not actually "hold the opinion" that the project would require 10 hours of plumbing work when the company made the statement.  *Id.* § 525 cmt. c; *cf. MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1111–13 (10th Cir. 2014) (Gorsuch, J.).

In addition, the two types of statements triggered different reliance rules.  The common law of fraud required a plaintiff to prove not just that the plaintiff subjectively relied on the defendant's misrepresentation but also that this reliance was objectively justifiable.  *See* Restatement (Second) of Torts § 537(a)–(b).  For false statements of fact, a plaintiff could establish that the plaintiff's reliance was objectively justifiable by showing that the statement addressed a "material" fact—e.g., one that Justice Holmes's "reasonable" person would find important when deciding on a course of action.  *Id.* § 538(1)–(2)(a).  For false statements of opinion, a plaintiff's reliance required more.  The plaintiff might attempt to establish that the opinion also impliedly conveyed a material *fact* that was false (for example, that the speaker knows of unstated facts that would justify the opinion).  *See id.* § 539(1)(b); *Omnicare*, 575 U.S. at 191–92.  But if the defendant gave a statement of pure opinion and did not convey any implied

facts, materiality alone would not establish justifiable reliance. *See* Restatement (Second) of Torts § 542. Instead, the common law barred a plaintiff from relying on an opinion absent a special circumstance (such as the unique expertise that a jeweler had when selling diamonds to ordinary consumers) or a special relationship (such as the fiduciary relationship between an attorney and a client). *Id.* § 542(a)–(b); *see* Dobbs et al., *supra*, § 676, at 682–83; Prosser, *supra*, at 760–63. But when two transacting parties had "equal competence" over the subject matter, the rule of caveat emptor controlled: neither party would be "justified in relying upon the opinion of the other." Restatement (Second) of Torts § 542 cmt. d.

Should these common-law rules extend to the False Claims Act? The statutory provision on which USN4U relies subjects "any person" to liability "who" "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). Section 3729(a)(1)(B) reaches any "false" "statement," so it likely could be read to cover both a "false" "statement" of fact and a "false" "statement" of opinion. *Id.*; *cf. Omnicare*, 575 U.S. at 182–86. Yet the subparagraph does not go further by telling us how to decide what a "false" "statement" is or when such a statement can generate a "false or fraudulent claim." Because the statute includes common-law terms of art (e.g., "material" and "fraudulent"), common-law principles can help identify the conduct that it covers. *See Neder v. United States*, 527 U.S. 1, 21–23 (1999). The Supreme Court has already made this point. The Court interpreted a nearby subparagraph to contain a "materiality" element even though, unlike § 3729(a)(1)(B), it did not use that term. *See Universal Health*, 579 U.S. at 187–88, 192–93. When doing so, the Court "presume[d]" that the Act contained all of the "elements of common-law fraud" that are not inconsistent with its text. *Id.* at 187 n.2.

I see nothing in the language of § 3729(a)(1)(B) inconsistent with the basic common-law dichotomy between facts and opinions. On this view of things, the False Claims Act might codify the common-law rules for deciding whether a "statement" is "false." A statement of fact would be "false" if the asserted fact did "not exist" in the real world. Restatement (Second) of Torts § 525 cmt. b. But a statement of opinion would not "be deemed 'false'" under the Act "simply because" it did not "pan out." *MHC Mut.*, 761 F.3d at 1113. Rather, the Act would treat an opinion as "false" only "if the person in question [did] not hold the opinion" when the opinion

was given.  Restatement (Second) of Torts § 525 cmt. c.  In this case, then, USN4U could not prove a "false" "statement" merely by showing that Wolf Creek's estimates of a project's labor hours exceeded the actual hours that a project took.  Rather, USN4U would have to establish that Wolf Creek affirmatively disbelieved the estimate at the time that Wolf Creek submitted it. I would also think that Wolf Creek's estimates would naturally account for the risk of unexpected developments, which could affect how many hours a project might take.  These estimates thus might be "provably false only in extreme cases" in which a project could not have taken as long as estimated under any conceivable set of circumstances.  Dobbs et al., *supra*, § 676, at 684.

On this view of things, the False Claims Act might also codify the common-law rules for deciding whether the government justifiably relied on a contractor's false statement.  The government could justifiably rely on a false statement of fact as long as the fact was material. *See* Restatement (Second) of Torts §§ 537(b), 538(1).  But the government could justifiably rely on a false statement of opinion only if the government identified one of the special circumstances or relationships required by the common law.  *See id.* § 542.  So USN4U might have a difficult time proving justifiable reliance if NASA and Wolf Creek had "approximately equal competence" to predict the number of hours that a project might entail.  *Id.* § 542 cmt. d; *see* Prosser, *supra*, at 762–63.  In that respect, the contract itself suggested that NASA had its own "experts" on which to rely.  Contract, R.39-2, PageID 3299.  To the extent Wolf Creek's work-order estimates were analogous to a buyer's false "assertion that $250 is [the] top-dollar price" that he will pay for a good (when in fact he knows he will pay more), such a "step" in the negotiation "process" might not create actionable fraud.  Dobbs et al., *supra*, § 676, at 683.

At day's end, though, I take no position on these issues.  This case pits our duty to answer only the legal questions that the parties raise against our duty to get the law right.  And the first duty should prevail over the second at this motion-to-dismiss stage.  The parties' briefing did not even identify any of the common-law principles governing "opinions," let alone suggest that they should make a difference.  I thus do not think we should resolve the appeal on the grounds that I have discussed.  At the same time, I raise these issues to ensure that our decision is not read as having impliedly rejected arguments that we did not consider.  The parties' failure to brief issues

should not create law by accident.  *See Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019). On this understanding, I concur in the opinion reversing the district court.