NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0215n.06

Case No. 24-1785

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 22, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF MICHIGAN *ex. rel*. ERIK OLSEN, M.D., WILLIAM BERK, M.D., and SAJITH MATTHEWS, M.D., | ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
|     Relators - Appellants | ) ) | |
| v. | ) ) | |
| TENET HEALTHCARE CORPORATION; DETROIT MEDICAL CENTER, | ) ) ) | O P I N I O N |
|     Defendants - Appellees. | ) ) | |

Before: COLE, McKEAGUE, and RITZ, Circuit Judges.

COLE, Circuit Judge. Three current and former physicians at Detroit-area hospitals allege that their hospitals' parent company, Tenet Healthcare Corporation, and subsidiary hospital system, Detroit Medical Center, fraudulently billed the government for inpatient care that patients did not and could not receive. They bring claims under the qui tam provisions of the Federal False Claims Act, 31 U.S.C § 3729 (FCA), and the Michigan Medicaid False Claims Act, M.C.L. § 400.610a(1) (MMFCA), on behalf of themselves, the United States, and the State of Michigan. The United States and the State of Michigan both declined to intervene. The district court dismissed the amended complaint for failure to state a claim. For the following reasons, we affirm.

No. 24-1785, *U.S., et al. ex rel. Olsen, et al. v. Tenet Healthcare Corporation, et al.*

I.

Because this case comes to us on appeal of a motion to dismiss, we "recite the facts as they are alleged in the complaint." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 937 (6th Cir. 2024). Tenet Healthcare Corporation (Tenet) is a for-profit, publicly traded healthcare services company that, through subsidiaries, joint ventures, and partnerships, operates around 700 healthcare facilities across the United States. One of Tenet's subsidiaries, Detroit Medical Center (DMC), is comprised of a non-acute care hospital, two ambulatory surgery centers, and five acute care hospitals, which include Detroit Receiving Hospital and Sinai-Grace Hospital.[1] Tenet acquired DMC—a formerly nonprofit institution considered the "'hospital of last resort' for the underserved inner-city population"—in 2013. (Am. Compl., R. 19, PageID 96, 104, 109.)

As alleged, defendants "fraudulently bill for inpatient care when patients are held in emergency room facilities ('ERs'), a practice known as 'boarding.'" (*Id.* at PageID 94.) These patients, with an inpatient admission order, are "boarded" in the ER until either a bed in an inpatient unit becomes available, or the patient is discharged. Generally, inpatient care is administered at a higher level than the care required in ERs and is reimbursed at higher rates, so boarded patients "ought to be billed as outpatient." (*Id.* at PageID 94, 112, 113.)

The staffing shortages caused by the COVID-19 pandemic intensified boarding at DMC, particularly at Detroit Receiving Hospital and Sinai-Grace Hospital, with patients being boarded in the ER "for far longer than medically reasonable." (*Id.* at PageID 110–11.) These boarding practices have continued, even as the pandemic's emergency conditions have receded. And while

---

[1] Detroit Medical Center is an assumed name for the health system entity VHS of Michigan, Inc. Since improperly naming a party can be cured by amendment, we analyze relators' claims as though they had named the proper property. *See Krupski v. Costa Crociere*, 560 U.S. 538, 548–89 (2010).

"some boarding in ERs is normal and even perfectly acceptable," the amended complaint describes defendants' boarding and billing practices as problematic in two respects. (*Id.* at PageID 95, 111.)

First, in pursuit of higher profits, defendants have let hospitals become understaffed. They have systemically reduced staffing or failed to ameliorate staffing shortages, resulting in inadequate resources to  provide inpatient care, yet still "aggressive[ly] bill[] for services . . . that do not actually occur." (*Id.* at PageID 96–97.) In other words, defendants bill for care that staff is not present to provide.

Second, defendants prioritize profit at the expense of patient care. They "refuse to spend resources to provide care for the crowded ERs created by the boarded patients[,]" resulting in a situation where patients do not receive the billed-for inpatient care or even the "observation level of care required in an ER setting." (*Id.* at PageID 94, 113.) So, while the government is being billed as if a boarded patient has been transferred to an inpatient department and is receiving the attendant care, the patient is actually "sitting in a hallway on a gurney, receiving no care at all." (*Id.* at PageID 118.)

The result is "systematic fraudulent billing, such that the federal and state governments are routinely being billed for services that do not actually occur." (*Id.* at PageID 97.) And the ensuing substandard care has severe consequences for ER-boarded patients. (*Id.* at PageID 113, 121.) The amended complaint offers six representative examples of substandard care. In every example, patients who had admission orders were boarded in the ER and left without appropriate care for several days.

In addition to the representative examples, the amended complaint identifies data from several hospital sources that track ER capacity, the number of patients being boarded, the length of their ER stay, and whether they were ultimately transferred to an inpatient unit. One internal

tracking system enables physicians to identify which boarded patients are listed as Medicaid or Medicare Advantage beneficiaries. The data from these sources shows that a serious boarding problem at DMC hospitals exists.

Erik Olsen, M.D., is an emergency room physician who has worked and trained at DMC hospitals since about 2004 and, until recently, practiced at Detroit Receiving Hospital. Frustrated by the declining quality of patient care at DMC since Tenet's acquisition and accelerated by the pandemic and his "realiz[ation] that Tenet was billing for services that he knew from his personal experience. . .were not being delivered," Olsen filed a qui tam complaint under seal against Tenet on July 13, 2022. (Compl., R. 1, PageID 17–18.) When the United States and the State of Michigan declined to intervene, the district court unsealed the complaint.

On January 18, 2024, Olsen amended his complaint to add two additional relators. He added Sajith Matthews, M.D., and William Berk, M.D., both physicians who, like Olsen, still practice or once practiced at DMC hospitals, including Detroit Receiving Hospital, both before and after Tenet's acquisition. (Am. Compl., R. 19, PageID 106–07.) The amended complaint also added DMC as a defendant. After filing the amended complaint, relators moved to consolidate the case with another pending case involving identical parties and underlying facts.

Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). They also argued that Berk and Matthews were added to the amended complaint in violation of 31 U.S.C. § 3730(b)(5)'s first-to-file bar, which permits only the government to "intervene or bring a related action based on the facts underlying the pending action." (Mot. to Dismiss, R. 28, PageID 166 (quoting 31 U.S.C. § 3730(b)(5)).)

The district court granted defendants' motion to dismiss and accordingly decided that relators' motion to consolidate was moot. Addressing defendants' first-to-file argument, the court

concluded that "the addition of relators by amendment does not implicate the first-to-file rule" and so Berk and Matthews's addition was permissible. (Op. and Order, R. 38, PageID 500.)

The district court also determined, however, that the amended complaint failed to satisfy Rule 12(b)(6) or Rule 9(b). Specifically, relators failed to "sufficiently allege that [d]efendants directly participated in the submission of any of the purported false claims" or "directed their subsidiary hospitals to bill government programs while knowing that, at the time the billing period began, the hospitals failed to render the care required for payment of medical claims by the government." (*Id.* at PageID 505–06.) And

> without allegations suggesting that [d]efendants made staffing decisions on behalf of the hospitals, and that they knowingly directed the hospitals to have physicians sign admission orders for patients and bill them as inpatients while they were boarded in the ER and not receiving care, liability for fraud cannot be imparted to [d]efendants as parent corporations.

(*Id.* at PageID 508.)

Relators timely appealed. Neither party challenges the district court's disposition of defendants' 31 U.S.C. § 3730(b)(5) first-to-file argument, so we do not reach the issue here.

II.

We review the grant of a motion to dismiss de novo, including dismissal for failure to plead with particularity under Rule 9(b). *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 502 (6th Cir. 2007) ("*Bledsoe II*") (citation omitted). In doing so, we accept all well-pleaded allegations in the complaint as true and view the facts in the relators' favor. *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 502 (6th Cir. 2008) (citation omitted). But to survive a motion to dismiss, the complaint must present facts that sufficiently state a facially plausible claim to relief. *Id.* (citation omitted). Unsupported, conclusory statements are insufficient, *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007), and are not entitled to the assumption of truth, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

III.

The FCA, 31 U.S.C. § 3729, "prohibits the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003) ("*Bledsoe I*"). Its qui tam provision empowers private individuals, known as relators, to bring actions alleging an FCA violation on the government's behalf. *Id.* (citing 31 U.S.C § 3730). The statute

> imposes liability when (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken 'knowingly,' i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim.

*Id.* (citing 31 U.S.C § 3729(a)(1), (b)).

Qui tam actions brought under the FCA are subject to Rule 9(b), which requires that a party "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b); *Bledsoe II*, 501 F.3d at 503. We interpret Rule 9(b)'s particularity requirement in conjunction with Rule 8(a)'s requirement for a short and plain statement. *Bledsoe II*, 501 F.3d at 503. In doing so, we do not "require omniscience," but we require that "the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988). Accordingly, relators "must allege the time, place, and content of the alleged misrepresentation [;] the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407–08 (6th Cir. 2016) (citation omitted).

While relators' allegations are concerning, particularly with respect to lapses in patient care arising from the described boarding practices, relators fail to meet their pleading requirements: they fail to plead with particularity a specific fraudulent claim for payment. That pleading deficiency alone requires dismissal.[2]

A.

The amended complaint alleges that Tenet and DMC "routinely bill Medicare, Medicaid and other government healthcare programs for inpatient care that was not delivered or capable of being delivered at the DMC's acute care hospitals' emergency departments." (Am. Compl., R. 19, PageID 112.) In doing so, relators describe a scheme where defendants "extract from the government 'money the government otherwise would not have paid.'" *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (quoting *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001)). And since the FCA applies to claims submitted by healthcare providers to government programs like Medicaid and Medicare, the alleged scheme would support a claim of fraud for purposes of an FCA action. *Id.* (noting that "one of [the FCA's] primary uses has been to combat fraud in the health-care field").

The FCA, however, "attaches liability [] not to the underlying fraudulent activity. . . but to the claim for payment." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877–78 (6th Cir. 2006) (citation omitted). Our caselaw thus imposes a "clear and unequivocal requirement that a relator allege specific false claims when pleading a violation of the FCA." *Kettering*, 816 F.3d at 411 (cleaned up). Of course, when relators allege a "complex and far-reaching fraudulent

---

[2] Relators raise several additional arguments, including that the district erred in holding that the amended complaint did not sufficiently plead that defendants directly participated in their subsidiaries' fraudulent conduct and, alternatively, that the district court erred in determining that relators failed to pierce the corporate veil. Since failure to plead with particularity alone requires dismissal under Rule 9(b), we do not reach those arguments here.

scheme," they are not required "to plead every specific instance of fraud." *Bledsoe II*, 501 F.3d at 509–10. But they are required to "provide[] examples of specific false claims submitted to the government pursuant to that scheme[.]" *Id.* at 510. A single representative example will do. *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 915 (6th Cir. 2017).

Relators contend that they have offered "six representative examples of patients who had admission orders but were boarded in the ER, while false claims for inpatient care were billed." (Appellant Br. 21; Reply Br. 6.) The first patient, who waited seven days for an inpatient bed without receiving intensive care, later died after finally being transferred to an inpatient unit. The second patient was boarded for about three days, during which time he did not receive appropriate care. The third patient waited almost eight days before being transferred but lost the eye that she was admitted to receive treatment on. One of the relators found the fourth patient "in her own urine and stool" after being boarded for more than six days without proper care, further worsening her health. (Am. Compl., R. 19, PageID 123.) The fifth patient, admitted in 2022 with respiratory failure caused by COVID-19, was found dead with his BiPAP breathing apparatus disconnected after being boarded for approximately thirty-six hours. The final patient was left in a hallway unattended for a day, without care or monitoring, and was later found by the physician "lying in her own feces and urine." (*Id.* at PageID 124–25.)

Each of these examples describe egregious lapses in patient care, but they fall short of the specificity pertaining to a fraudulent claim for payment required to satisfy Rule 9(b). For example, in *United States ex rel. USN4U, LLC v. Wolf Creek Federal Services*, 34 F.4th 507 (6th Cir. 2022), we determined that a complaint satisfied Rule 9(b) where it alleged specific examples of false quotes and invoices submitted by the defendant to the government. *Id.* at 512, 514. Those examples detailed specific work order proposals that the defendant submitted to the government

and alleged that those work orders overestimated costs and labor hours, as calculated using industry standards. *Id.* at 514 ("The proposal that [the defendant] submitted to [the government] stated that the project would take 80 carpenter hours, 20 HVAC mechanic hours, and 16 plumber hours. [The relator], however, alleges that the project required only 7 carpenter hours, 6 HVAC mechanic hours, and zero plumber hours.").

Here, relators provide "no specific information about the filing of the claims themselves" with respect to each example. *Sanderson*, 447 F.3d at 877. And the "complaint neither identifies which of the named defendants actually submitted falsified [invoices or bills] to the government, nor which [documents or reimbursement claims] contained misrepresentations upon which the government relied." *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 (6th Cir. 2005). Nor does the amended complaint allege that defendants instructed or required the medical professionals in any of these cases to board these six patients for any period of time and to bill for care that was not administered.

Moreover, although these examples suggest troubling mismanagement, the prolonged boarding practices they describe do not create an automatic inference of fraud on the part of the defendants. *Cf. United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332 (6th Cir. 1998). Boarding is not an automatically fraudulent practice: the amended complaint itself concedes that "some boarding in ERs is normal and even perfectly acceptable," so long as staff can provide the requisite care. (Am. Compl, R. 19, PageID 95.) And, as the district court observed, Tenet and DMC's "protocol" to bill boarded patients as "inpatient" upon a physician's issuance of an admission order—rather than the moment when a patient is given a bed in an inpatient unit—is consistent with federal regulations. *See* 42 C.F.R. § 412.3(a) ("For purposes of payment under Medicare Part A, an individual is considered an inpatient of a hospital, including a critical access

hospital, if formally admitted as an inpatient pursuant to an order for inpatient admission by a physician or other qualified practitioner[.]") Relators fail to identify the point at which a "normal" or "perfectly acceptable" decision to board a patient is converted into a fraudulent action. (*See* Am. Compl, R. 19, PageID 95.)

Instead, relators argue that defendants' boarding practices are inherently fraudulent because their resources and staffing "cause patients to be billed as inpatient while still boarded in the ER" and because defendants bill for inpatient care despite "already know[ing] that the hospital will not—indeed, cannot—provide inpatient care to [patients]." (Appellant Br. 27.) But general policies and practices, as troubling as they may be, cannot satisfy Rule 9(b)'s particularity requirements without further detail. *See, e.g.*, *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1312 (11th Cir. 2002) (determining that a relator's allegations fell short of Rule 9(b) where the relator alleged general practices that resulted in the submission of false payment claims to the government, but did not identify charges, actual dates, policies about billing, second-hand information about billing practices and did not provide a copy of a single bill or payment).

The general allegations supported by data from the hospitals' internal tracking systems also lack the necessary specificity. For example, relators point to one system that reported that patients at Detroit Receiving Hospital in December 2022 "spent a total of 24,246 hours boarded in the ER," which "equates to billing more than one thousand inpatient treatment days." (Am. Compl., R. 19, PageID 129.) But relators do not identify any specific false claim for payment submitted to the government during that time; they instead rely on an inference that false claims must have been submitted. Rule 9(b), however, "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply [] that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."

*Sanderson*, 447 F.3d at 877 (quoting *Clausen*, 290 F.3d at 1311). We have thus repeatedly held that such allegations are insufficient. *See, e.g.*, *Kettering*, 816 F.3d at 412; *Sanderson*, 447 F.3d at 877; *Snapp*, 532 F.3d at 506.

Relators further argue that, even without identifying the submission of a specific claim, they can still satisfy the requirement by pleading "facts which support a strong inference that a claim was submitted." (Appellant Br. 24 (quoting *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 768–69 (6th Cir. 2016).) Indeed, we have previously determined that a relator's specific personal knowledge of a defendant's billing practices may support a strong inference that defendants submitted false claims, thereby satisfying Rule 9(b)'s particularity requirement even without the identification of a specific representative claim. *Prather*, 838 F.3d at 768–69. But this exception is a narrow one and limited to circumstances where a relator has detailed personal knowledge of the relevant payment scheme. *See United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881–82 (6th Cir. 2017).

In *Prather*, for example, we determined that a relator's "detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment" to Medicare was sufficient to overcome her failure to identify a particular request to the government for payment. *Prather*, 838 F.3d at 770. But in that case, the relator's job responsibilities included reviewing documentation for Medicare claims. *Id.* And, as part of her complaint, the relator "identified approximately the dates of the applicable episode of care and the dates on which [relevant certifications and documentation] were signed, alleged that requests for anticipated payment and for final payment were submitted (sometimes giving dates of submission for one or both), and identified the amount that was requested for the final payment." *Id.* at 769–70.

Relators here fall short of alleging this level of personal knowledge of and access to Tenet and DMC's billing practices and policies. Indeed, relators themselves concede that they "do not know at this stage of the litigation precisely which entity keys in the bills[.]" (Appellant Br. 18).[3] Relying on *Evans-Marshall v. Board of Education*, 428 F.3d 223 (6th Cir. 2005), they instead argue that "it is not necessary that they know every detail of the scheme at this stage." (Appellant Br. 18.) But *Evans-Marshall* did not involve fraud claims subject to Rule 9(b)'s heightened pleading requirements. 428 F.3d at 226. And "at a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson*, 447 F.3d at 877 (citation and brackets omitted). The "who" is therefore a minimum requirement. *Id.*

We are sensitive to relators' situation. As physicians, they may have limited visibility into defendants' billing practices and policies. They may also lack access to information about which entity—the non-party hospitals, the hospital system, or the hospital system's parent company—is ultimately responsible for submitting claims to the government and about the content of those claims. Relators have instead alleged what they know as physicians: that some of their patients are not being administered the care they were admitted to the hospital to receive. But "neither the Federal Rules nor the [FCA] offer any special leniency under these particular circumstances to justify [relators] failing to allege with the required specificity the circumstances of the fraudulent conduct [they] assert[] in [their] action." *See Clausen*, 290 F.3d at 1314.

In failing to identify a false claim, relators therefore cannot satisfy Rule 9(b)'s minimum pleading requirements. As such, we need not determine whether they sufficiently allege falsity,

---

[3] Relators argue that, if VHS of Michigan, Inc. should be named rather than DMC, they should be permitted to amend their complaint. But they did not move to amend below. In any case, even if VHS of Michigan, Inc. was named, the pleading deficiencies described here would remain unchanged, so dismissal is appropriate. *See United States ex rel. VIB Partners v. LHC Group, Inc.*, No. 24-5393, 2025 WL 1103997, at *4 (6th Cir. Apr. 14, 2025) (denying request for leave to amend in an FCA case because, in part, "[w]ithout specifying how the proposed amendments would address the deficiencies, Relators have failed to provide a meaningful basis for the court to evaluate their request").

scienter, materiality, and causation to conclude that the district court correctly dismissed their FCA claims.

## IV.

Since claims brought under the FCA and MMFCA are "identical in every relevant respect here and are frequently analyzed in tandem," *United States v. Wal-Mart Stores East, LP*, 858 F. App'x 876, 880–81 (6th Cir. 2021), relators' MMFCA claims are subject to the same analysis as above. The district court therefore did not err in dismissing them.

## V.

For the foregoing reasons, we affirm the district court's judgment.